J^FOIL, J.
The Norfolk Southern Corporation and certain of its affiliated railroad companies (collectively, Norfolk)[1] filed this lawsuit for declaratory judgment and damages against various underwriting members of Lloyd’s London and certain London Market Insurance Companies (collectively, the London Insurers). In its original and amended petitions, Norfolk sought a declaration that it had coverage under several excess comprehensive general liability policies subscribed to by the London Insurers from 1960 to 1986 for the costs of cleaning up various polluted sites around the United States, including the Jennison-Wright site in Toledo, Ohio.[2] Two judgments concerning the Jennison-Wright site are challenged in separate appeals numbered 2002 *203 CA 2696 and 2003 CA 0110.[3] In appeal number 2002 CA 2696, the London Insurers challenge a summary judgment rendered in favor of Norfolk, finding coverage under the excess policies. In appeal number 2003 CA 0110, the London Insurers challenge a judgment rendered following a cost trial, which judgment determined Norfolk’s ultimate net loss and purportedly resolved any issues of exhaustion of self-insured retention limits (SIRs) and/or allocation. Although the cases have not been consolidated for appeal, because many of the issues pertaining to each appeal are interrelated, we address them both in a single opinion. For the reasons that follow, we affirm the summary judgment rendered on the issue of coverage, affirm the trial court’s finding as to ultimate net loss, and reverse and render judgment on the issues of exhaustion of SIRs and/or allocation.
[¡¡FACTS AND PROCEDURAL BACKGROUND
Norfolk filed this suit for declaratory judgment and for damages against the London Insurers[4] seeking reimbursement for costs expended by Norfolk in remediat-ing various environmental sites located throughout the United States, including the one at issue in this appeal, the Jenni-son-Wright site in Toledo, Ohio.
The former Jennison-Wright facility (JW site) spans over 23 acres. Norfolk and Western Railway Co. (N & W) owns approximately 16 acres of the site. Penn Central Railroad originally owned the remaining acreage until it was later transferred to Consolidated Rail Corp. (Conrail). Beginning in 1910, N & W leased its property to the Jennison-Wright Corp., which operated a wood treatment facility using creosote. During the wood treatment process that spanned many years, creosote dripped onto and seeped into the ground, ultimately resulting in soil and groundwater contamination.
In November 1989, the Jennison-Wright Corp., which was in the process of remedi-ating the JW site, declared bankruptcy. Subsequently, in April, 1990, the Ohio state EPA notified N & W of its potential liability for the remediation of the JW site based on its ownership interest in the underlying property. Negotiations between N & W and the Ohio state EPA over the site went on for four years. Ultimately, in 1994, the EPA formally approved a Remedial Action Work Plan submitted by a remediation contractor retained jointly by N & W and Conrail. By means of this suit, Norfolk seeks reimbursement for the costs it has expended in remediating the JW site.
Pursuant to the various excess liability policies in effect from 1960 to 1986 issued to Norfolk and Western Railway Co. (N & W) and Norfolk Southern Corp., the London Insurers agreed as follows:
To indemnify the Assured for any and all sums which the Assured shall be legally liable to pay and shall pay as damages Land expenses as more fully defined by the term “ultimate net loss” on account of personal injuries and property damage as herein defined arising out of occurrences happening during the policy period and due to the conduct of the Assured’s business.
The term “occurrence” was most commonly defined in the policies as “one happening *204 or series of happenings, arising out of or due to one event.” The policies do not define the terms “happening” or “event.” The policies defined “property damage” to exclude damage to property owned by the assured or property in the care, custody, or control of the assured.[5]
All of the policies provided excess insurance coverage in successive layers above a substantial SIR in accordance with the terms of the policies. Throughout all policy periods, Norfolk chose to self-insure at the primary level and maintained SIRs of at least $1,000,000 per occurrence.
On November 23, 1999, Norfolk filed a motion for summary judgment as to insurance coverage for the JW site for remediation costs incurred as a result of creosote contamination caused by the operations of its lessee. The London Insurers opposed the motion with evidence allegedly demonstrating disputed issues of material fact. On January 6, 2000, the London Insurers filed a motion for summary judgment based on the alleged undisputed facts regarding Norfolk’s losses and the law on allocation and exhaustion of SIRs, which the insurers claimed required a dismissal of Norfolk’s claims. The trial court denied the London Insurers’ motion and thereafter granted Norfolk’s motion. In granting the summary judgment, the trial court concluded that the event triggering coverage under the policies was groundwater contamination. Judgment was signed February 1, 2000.[6] Thereafter, the London Insurers filed a motion for review of the interlocutory ruling, asking the trial court to review its grant of summary judgment. Before ruling onj^the motion, however, the trial court designated the judgment final and appealable. This appeal by the London Insurers followed.
SUMMARY JUDGMENT
A motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966 B. Appellate courts are to review summary judgments de novo under the same criteria that govern the district court’s consideration of whether summary judgment is appropriate. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. Calhoun v. Hoffman-La Roche, Inc., 98-2770, p. 4-5 (La.App. 1 Cir. 2/18/2000), 768 So.2d 57, 60-61, writ denied, 00-1223 (La.6/23/2000), 765 So.2d 1041.
DISCUSSION
Within their second assignment of error, the London Insurers argue that the trial court erred in granting Norfolk’s motion for summary judgment as a matter of law. Specifically, they assert that the court erred in deciding that Ohio substantive law should apply to the claims regarding the JW site and then relying on a Kansas case in purporting to apply Ohio law.
By judgment dated August 26, 1999, the trial court ruled that the substantive law of *205 the state in which each environmental site is physically located would be applied to determine the issues remaining to be litigated. Among those sites is the JW site in Ohio. In granting summary judgment and finding coverage in this case, however, the trial court relied on Cessna Aircraft Co. v. Hartford Acc. & Indem. Co., 900 F.Supp. 1489 (D.Kan.1995), a Kansas case. This is of no moment to our de novo review of the record before us. We shall apply Louisiana law to the issue of coverage because the London Insurers admit there is no conflict between the laws of | Bthe involved states. See Norfolk Southern Corp. v. California Union Ins. Co., 02-0369, 0371 and 0372, p. 30 n. 44 (La.App. 1 Cir. 9/12/03), 859 So.2d 167, 190, 2003 WL 22110450, citing Favaroth v. Appleyard, 00-0359, pp. 4-5 (La.App. 4 Cir. 5/2/01), 785 So.2d 262, 265, writ denied, 01-1945 (La.11/9/01), 801 So.2d 375. The London Insurers argue that under any law, these excess policies were not even triggered and could not be found summarily to provide coverage. They argue specifically that liability under the excess policies is only triggered when the losses exceed the limits underlying all of the policies at issue. We disagree.
A review of the record indicates that the property damage for which Norfolk sought coverage at the JW site was the contamination arising out of the wood-preserving operations carried out at the site over the course of many years. Indeed, the trial court specifically found that the event triggering coverage in this case was groundwater contamination. The Jennison-Wright Corp. leased the site for use as a creosote facility from 1910 to 1990. As was the case with two of the Louisiana sites previously addressed by this court,[7] the operations conducted at the JW site resulted in the routine deposit of contaminants onto the ground throughout the periods that the facility was in operation. In cases involving long-term environmental damage such as here, the property damage is generally not due to a single catastrophic event, but to numerous releases and discharges taking place over an extended period of time. In the cases dealing with the Louisiana sites, this court considered the characteristics of long-term environmental damage, the relevant policy language, and the facts of the case, and determined that the exposure theory is applicable to determine which policies, if any, were triggered. See Norfolk Southern Corp. v. California Union Ins. Co., 02-0369, 0371 and 0372, p. 32 (La.App. 1 Cir. 9/12/03), 859 So.2d 167, 192. We will likewise apply that theory here.
Under the facts of this case, wood-preserving operations occurred in every year from 1910 to 1990. The London Insurers provided excess liability coverage to Norfolk from 1960 to 1986. Therefore, application of the exposure theory would result in triggering the policy periods existing during those years. The evidence shows that numerous releases, drips, and spills occurred as a normal part of the wood-preserving operations in each year the site was operational. As stated in the Norfolk cases involving the Louisiana sites, the drips and spills are to be considered as one occurrence. Id., 02-0369, 0371 and 0372 at p. 33, 859 So.2d at 192. Therefore, a single occurrence took place in each policy period from 1960 to 1986 and each policy existing during those years was triggered.
*206 The trigger of coverage is the event or condition that determines whether or not a policy responds to a specific claim. Norfolk Southern Corp. v. California Union Ins. Co., 02-0369, 0371 and 0372, p. 31 n. 45 (La.App. 1 Cir. 9/12/03), 859 So.2d 167, 190-91. Finding that a policy has been triggered, however, does not end the inquiry into whether or not coverage exists under that policy. Rather, we must next consider additional policy terms, including any limitations, exclusions, or defenses the insurer may raise. Id.
Here, in their first assignment of error, the London Insurers urge that the trial court erred in granting Norfolk’s motion for summary judgment as to coverage in the face of at least six obviously disputed facts material to the question of coverage, including: 1) whether the damage was due to an occurrence in each policy period; 2) whether only one occurrence in each policy period caused Norfolk’s alleged losses; 3) whether the alleged damage was to third-party property or owned property; 4) whether the occurrences and resulting damage were due to the conduct of the assured’s business as required by the policies; 5) whether Norfolk complied with the notice |sconditions of the policies; and 6) whether the alleged losses arose from fortuitous events. Also, in their third assignment of error, the London Insurers urge that the trial court erred in finding coverage under policies issued from 1976-1982 and from 1985-1986 despite pollution exclusions contained in those policies.
As noted above in our application of the exposure theory, we have already held that an occurrence took place in each policy period and that only one occurrence in each policy period gave rise to the damage. There are no disputed issues of material fact in this regard.
We likewise find no disputed issue of material fact as to whether the alleged damage was to third-party property or owned property. The London Insurers agreed to indemnify Norfolk for damages and expenses due to property damage. The policies defined property damage to exclude damage to property owned by Norfolk or in its care, custody or control. The property damage at the JW site consisted primarily of soil and groundwater contamination. In the cases dealing with the three sites in Louisiana, this court held that costs expended in connection with efforts to remediate damage to the groundwater, whether it was below Norfolk’s property or third-party property, would not be excluded from coverage pursuant to the owned property exclusion because such groundwater is not owned by the insured. Norfolk Southern Corp. v. California Union Ins. Co., 02-0369, 0371 and 0372, p. 35 (La.App. 1 Cir. 9/12/03), 859 So.2d 167, 193-94.
Next, we find there is no issue of material fact as to whether the occurrences and resulting damage were due to the conduct of the assured’s business as required by the policies. This court previously held that Norfolk’s liability as the lessor/owner of property at one of the Louisiana sites arose out of the conduct of its business. Specifically, this court noted that Norfolk often leased property to other companies in order to obtain customers for its rail service. Norfolk Southern Corp. v. California Union Ins. Co., 02-0369, 0371 and 0372, p. 38 (La.App. 1 Cir. 9/12/03), 859 So.2d 167, 195.
Regarding the issue of notice, based on the record before us we conclude that there is no issue of material fact as to whether Norfolk complied with the notice conditions of the policies. The evidence shows that the Ohio EPA first notified N & W of its potential responsibility for remediating the JW site on April 23, 1990. *207 After that, N & W and Conrail began negotiations with the EPA that lasted for many years. Norfolk’s liability for the remediation expenses was not formally established until June 2, 1994. When Norfolk learned that the Jennison-Wright Corp. was not going to honor its remediation obligation, it gave notice to its insurers on October 10, 1990. We find this was sufficient to comply with the notice requirements of the policies.
Finally, we find no issue of material fact exists as to whether the alleged losses arose from fortuitous events. The London Insurers contend the damages sustained by Norfolk were not fortuitous because Norfolk chose to lease the JW site to the Jennison-Wright Corp. for the purpose of conducting known contaminating operations on the property. Based on the evidence presented, however, we conclude that the London Insurers failed to demonstrate that Norfolk acted with the specific intent to cause the property damage that occurred here. As such, we find the fortuity exclusion does not apply in this case.
Based on our de novo review, we conclude that summary judgment on coverage was appropriate in this case as there were no genuine issues of material fact and Norfolk was entitled to judgment as a matter of law. As such, we affirm the trial court’s judgment signed on February 1, 2000.[8]
|inCOST TRIAL/ALLOCATION
DISCUSSION
Following the summary judgment on the issue of coverage, a cost trial was subsequently held on November 6 and 8, 2001, to determine Norfolk’s ultimate net loss and to resolve any issues of exhaustion of SIRs and/or allocation. Following Norfolk’s presentation of its case-in-chief, the London Insurers moved for dismissal of the claims, contending that Norfolk was unable to demonstrate that is costs were linked to the event — groundwater contamination — previously found by the trial court to be the event covered under the policies. The court took the motion under advisement and took additional evidence in London’s case-in-chief. On May 15, 2002, the trial court signed a judgment finding that Norfolk established an ultimate net loss of $4,492,717.96. The judgment further awards Norfolk pre-judgment and post-judgment interest “on all costs beyond their single retention.” In the judgment, the trial court does not specifically impose an obligation on the London Insurers to indemnify Norfolk for all amounts above a single retention, nor does it specifically apply an “all sums” approach as it did in the cases involving the Louisiana sites. See Norfolk Southern Corp. v. California Union Ins. Co., 02-0369, 0371 and 0372 (La.App. 1 Cir. 9/12/03), 859 So.2d 167. London asserts that the trial court erred to the extent that it implicitly committed these actions. In light of our holding in the Louisiana sites cases, we agree.
In the cases dealing with the Louisiana sites, this court determined that coverage would be allocated among the various triggered policies by applying a pro *208 rata approach as opposed to an “all sums” approach. Under | nsuch an approach, liability is allocated on a pro rata basis over all periods in which contaminating activities took place, including those years in which Norfolk was uninsured. Accordingly, the amount of the judgment is divided by the total number of years that contaminating activities took place to obtain a judgment amount per year. Norfolk Southern Corp. v. California Union Ins. Co., 02-0369, 0371 and 0372, pp. 42-43 (La.App. 1 Cir. 9/12/03), 859 So.2d 167, 198. We will likewise use the pro rata approach here.
In this case, the trial court found that Norfolk suffered an ultimate net loss of $4,492,717.96 in connection with the JW site. On review, we conclude that this finding is supported by the record. As such, that amount must be allocated among all years from 1910 to 1990 (years the JW site was in operation), for a total of eighty-one years. This results in a per year allocation of $55,465.653. Norfolk is responsible for those amounts allocable to the periods from 1910 through 1960, and from 1986 through 1990, when it was not insured. In addition, Norfolk must meet its SIR in every policy period from 1960 to 1986, as required by the terms of the policies. It is clear, however, that the amount allocable to each of the policy periods is not sufficient to exceed even one SIR.[9] Therefore, under the facts of this case and considering the per year judgment amounts calculated above, the London Insurers do not owe any indemnification with regard to the JW site.[10] Accordingly, we must vacate that portion of the trial court’s judgment signed on May 15, 2002 that is to the contrary, whether it be specific or implied.
CONCLUSION
For the foregoing reasons, we affirm the summary judgment signed February 1, 2000, finding coverage in favor of the plaintiff, Norfolk, under 11gthe policies existing from 1960 to 1986 with regard to the Jennison-Wright site in Toledo, Ohio.
We further affirm that part of the cost judgment finding Norfolk’s ultimate net loss at the Jennison-Wright site to be $4,492,717.96. We reverse that part of the judgment awarding pre- and post-judgment interest on all costs beyond Norfolk’s single retention incurred in connection with the Jennison-Wright site from the date on which the costs were paid. To the extent that the judgment purports to allocate the losses utilizing the “all sums” theory, it is reversed. Judgment is hereby rendered ordering the allocation of the losses pursuant to the pro-rata approach on the basis of each insurers’ time on the risk and degree of risk assumed. Judgment is further rendered in favor of the defendants, Certain Underwriting Members of Lloyd’s and Certain London Market Companies, finding that pursuant to the allocation method applied, they do not owe any indemnity with regard to the Jen-nison-Wright site. Costs of these appeals are assessed to Norfolk.
2002 CA 2696: SUMMARY JUDGMENT AFFIRMED.
2003 CA 0110: JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
GAIDRY, J., concurs in results without reasons.

. In addition to Norfolk Southern Corporation, the plaintiffs in this action are Norfolk Southern Railway Company, Norfolk and Western Railway Company, The Alabama Great Southern Railroad Company, Southern Region Industrial Realty, Inc., Central of Georgia Railroad Company, and The Cincinnati, New Orleans, and Texas Pacific Railway Company. Except where reference to the specific entity is necessary for clarity, we will refer to the plaintiffs collectively as Norfolk.

. Norfolk’s fourth amending petition sought coverage for numerous environmental sites in Louisiana (3 sites), Tennessee (3 sites), Ohio (1 site), Georgia (4 sites), Virginia (7 sites), West Virginia (4 sites), Kentucky (1 site), South Carolina (2 sites), Florida (1 site), Illinois (2 sites), North Carolina (1 site) and Arkansas (1 site). The sites proceeded to trial either separately or in groups of sites located in the same state. These appeals deal only with the judgments concerning the Ohio site.

. All judgments were designated final and ap-pealable.

. In its original and amending petitions, Norfolk named numerous non-London market insurance companies as defendants in addition to the London Insurers. At the time of trial, however, the London Insurers were the only defendants remaining in the lawsuit.

. Some of the policies placed these restrictions within the definition of “property damage,’’ whereas others placed the restrictions in the exclusions section of the policy.

. Thus, the only remaining issue concerned the amount of money Norfolk expended remediating the JW site. That issue was resolved during an evidentiary hearing conducted in November 2001, which ruling is the subject of the appeal bearing docket number 2003 CA 0110, also addressed in this opinion.

. See Norfolk Southern Corp. v. California Union Ins. Co., 02-0369, 0371 and 0372 (La.App. 1 Cir. 9/12/03), 859 So.2d 167.

. We find no merit in the London Insurers’ assertion that the trial court erred in designating the summary judgment as final and appealable without hearing and resolving its pending motion for review of that interlocutory ruling. We construe the court’s silence as to the pending motion as a rejection of the relief requested therein. See Norfolk Southern Corp. v. California Union Ins. Co., 02-0369, 0371 and 0372, p. 20 n. 35 (La.App. 1 Cir. 9/12/03), 859 So.2d 167, 184.
Further, Norfolk filed a motion to strike the London Insurers' brief in connection with the appeal from the granting of summary judgment, number 2002 CA 2696. This court referred the motion to strike to the merits. We have considered the motion and deny it as meritless.

. The policies had varying SIRs, the lowest of which was $1,000,000 per occurrence.

. Because of this holding, we pretermit discussion of any other issues raised in either appeal by the London Insurers.