[No. B189000. Second Dist., Div. Four. Jan. 9, 2007.]

LONDON MARKET INSURERS, Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
TRUCK INSURANCE EXCHANGE et al., Real Parties in Interest.

## COUNSEL

Duane Morris, Brian Kelly and Christina C. Marshall for Petitioners.

No appearance for Respondent.

Gibson, Dunn & Crutcher and Scott R. Hoyt for Real Party in Interest Truck Insurance Exchange.

Jones Day, Elwood Lui, Philip E. Cook, Reed T. Aljian and J. W. Montgomery III for Real Party in Interest Kaiser Cement & Gypsum Corporation.

Carroll, Burdick & McDonough, Rodney L. Eshelman, David M. Rice and Laurie J. Hepler for Real Parties in Interest Columbia Casualty Co., Continental Insurance Co., and London Guarantee & Accident Company of New York.

OPINION

**SUZUKAWA, J.**—This petition for writ of mandate presents an issue of first impression in this state: the meaning of "occurrence" in a commercial general liability (CGL) policy as applied to bodily injuries caused by exposure to asbestos. We conclude that, as used in the policies at issue, "occurrence" means injurious exposure to asbestos, not the manufacture and distribution of those products. Accordingly, we grant the writ and direct the trial court to vacate its summary adjudication order.

## INTRODUCTION

Real party in interest Kaiser Cement & Gypsum Corporation (Kaiser) manufactured a variety of products containing asbestos (asbestos products) for more than 30 years. In recent years, Kaiser has been named as a defendant in products liability suits brought by thousands of claimants who allege they were injured by their exposure to Kaiser's asbestos products. These claims have been defended by Kaiser's primary general liability carrier, real party in interest Truck Insurance Exchange (Truck).

After making indemnity payments for Kaiser of more than $50 million, Truck filed an action seeking, among other things, a declaratory judgment that Truck's policies were exhausted and that Truck had no further duty to defend or indemnify Kaiser in asbestos-related litigation. Subsequently, Truck sought summary adjudication of the declaratory judgment cause of action. The summary adjudication motion turned on the meaning of the word "occurrence" as used in the CGL policies. According to Truck, all claimants' asbestos injuries resulted from a single "occurrence"—Kaiser's manufacture and distribution of asbestos products—and thus were subject to the policies' per occurrence liability limits. Thus, Truck contended, because its indemnity payments exceeded policy limits, the policies were exhausted and it had no further obligation to Kaiser.

Petitioners London Market Insurers (LMI), Kaiser's excess insurers, opposed the summary adjudication motion, arguing that the relevant "occurrence" was each claimant's asbestos exposure, not Kaiser's manufacture or distribution of asbestos products. Accordingly, LMI contended, the court could not conclude as a matter of law that all of Kaiser's asbestos claims resulted from a single occurrence or that Truck's policies had been exhausted.

The trial court agreed with Truck that the "occurrence" was Kaiser's decision to manufacture and distribute asbestos products and, thus, that all asbestos injuries arose out of a single annual occurrence. It accordingly granted summary adjudication.

We find that the trial court's interpretation cannot be reconciled with the policies' plain language, which compels our conclusion that an "occurrence" under the policies is injurious exposure to asbestos, not the manufacture and distribution of asbestos products. Thus, the trial court erred in determining that all asbestos injuries arose from a single annual occurrence as a matter of law. Moreover, on the present record we cannot determine how many occurrences are responsible for the alleged injuries and, thus, whether Truck's policies have been fully exhausted. Accordingly, we grant the writ and direct the trial court to vacate its order granting Truck's motion for summary adjudication and to enter a new order denying the motion.

## FACTUAL AND PROCEDURAL BACKGROUND

Kaiser manufactured a variety of asbestos products, including joint compounds, finishing compounds, fiberboard, and plastic cements, from 1944 through the 1970's. Kaiser produced these products at 10 different facilities at various times.

By 2004, more than 24,000 claimants (including, among others, carpenters, electricians, sheetrockers, painters, welders, shipyard workers, mechanics, plasterers, plumbers, tile setters, acoustical sprayers and architects) had filed products liability suits against Kaiser alleging that they had suffered bodily injury, including asbestosis and various cancers, as a result of their exposure to Kaiser's asbestos products. Kaiser tendered these claims to Truck, which had issued primary CGL policies to Kaiser between 1964 and 1983. As of July 31, 2001, Truck had paid approximately $22 million to more than 900 asbestos claimants; by October 2004, Truck's indemnity payments for asbestos bodily injury claims exceeded $50 million.

In April 2001, Truck filed an insurance coverage action concerning its obligations to continue to defend and indemnify Kaiser for asbestos bodily injury claims. Kaiser filed a cross-complaint against its excess insurers, including LMI, seeking a declaration of coverage under its excess policies in the event Truck were able to establish that it had no further obligation to defend or indemnify Kaiser.

In October 2004, Truck moved for summary adjudication that all its policies had been exhausted and it had no further duty to defend or indemnify Kaiser.[1] The basis for Truck's motion was the "per occurrence" liability limitation in its CGL policies, which capped Truck's exposure for bodily

---

[1] Truck's summary adjudication motion addressed only the first cause of action, which sought a declaratory judgment that Truck had exhausted all applicable policy limits for asbestos bodily injury claims. The parties stipulated that the motion did not seek summary

injuries resulting from "any one occurrence." According to Truck, under the plain language of the policies, all asbestos-related claims in any given year arose out of a single "occurrence" because all had the same underlying cause: "the design, manufacture and distribution by Kaiser and its subsidiaries of asbestos-bearing products." Further, Truck urged that the parties' course of conduct—specifically, Kaiser's payment of a single deductible per policy year for all asbestos bodily injury claims, rather than a deductible for each claim—was consistent with the conclusion that all asbestos claims resulted from a single occurrence. Thus, notwithstanding its indemnity payments exceeding $50 million, Truck contended that its liability for asbestos bodily injury claims for all policy years was only $8.3 million and that the policies were exhausted as of January 1999.

Kaiser responded that Truck was entitled to summary adjudication, but contended that its analysis was only " 'half right.' "[2] Kaiser agreed that under the plain language of Truck's policies, all asbestos bodily injury claims resulted from a single annual occurrence. Thus, it agreed that Truck's policies had been exhausted. However, Kaiser did not agree that this result was compelled by the course of the parties' performance; to the contrary, Kaiser contended that neither it nor Truck ever believed that they had reached an agreement on the number-of-occurrences issue.

LMI opposed the summary adjudication motion, contending that the court could not conclude as a matter of law that all asbestos bodily injury claims resulted from a single annual occurrence or that Truck's policies had been exhausted. Further, LMI contended that the parties' conduct demonstrated that they believed that the asbestos claims resulted from multiple occurrences. Thus, LMI urged that Truck's motion should be denied because there were triable issues of fact as to the meaning of "occurrence."

The trial court initially denied the summary adjudication motion. It explained that under California law, insurance policies are interpreted based on their plain language and the insured's objectively reasonable expectations when the policies are issued. Further, it said that in California "occurrence"

---

adjudication or any other ruling as to policy limits for asbestos *property damage* claims, except to the extent that Truck's policies provide for a combined single limit for property damage and bodily injury claims.

[2] The unusual alignment of the parties is explained by the policies' per occurrence deductible provisions. Under the 1964 policy, Kaiser was responsible for the first $5,000 of loss for each "occurrence"; by 1981, the per occurrence deductible was $100,000. Thus, Kaiser's share of the total asbestos liability increases as the number of occurrences increases. Additionally, although asbestos claims against Kaiser collectively exceed tens of millions of dollars, many individual claims apparently are within the applicable deductibles. Thus, if each claim is treated as a separate occurrence, Kaiser may have no coverage for a substantial number of claims.

means the "underlying cause of injury—the act, or acts, of the insured that gives rise to the ABIC [asbestos bodily injury claims]." Thus, the dispositive question was whether Kaiser reasonably could have believed that its decision to incorporate asbestos into many different products over many decades was a single occurrence. The court held that it could not: "[A]s a matter of law . . . it is not now, nor was it at the time the Truck policies were issued, objectively reasonable to assume that the incorporation of chrysotile asbestos into multiple products over a period of many years would constitute a single occurrence."

Although the court thus concluded that the asbestos bodily injury claims were not a single occurrence as a matter of law, it said that on the present record it could not decide how many occurrences were responsible for the asbestos claims. It explained: "The more difficult issue presented by Truck's motion is determining the *number* of occurrences under the policies, given that they are to be determined based on an analysis of the underlying cause of injury. The Court finds that a reading of the policies as a whole does not support a determination that the manufacture, sale, and distribution of all Kaiser's asbestos-containing products constitute a single 'occurrence.' By the same token, however, the policies do not support LMI's interpretation that each ABIC filed against Kaiser was an 'occurrence.' While a 'decision' to manufacture a given product in a certain manner, or warn or not warn of the dangerous propensities of that product may constitute an occurrence, such a decision must be made with reference to a product or family of products."

Thus, the court said, by denying summary adjudication it was "not determining that the number of occurrences under the Truck policies will necessarily be the total number of individual asbestos bodily injury claims. Given the language of the policies, there may be evidentiary support for a finding that the 'design, manufacture, and distribution' of a family of products, or a particular product line, constituted an occurrence under the post-'74 policies." Accordingly, "The determination of the actual number of occurrences under the Truck policies will be subject to further evidentiary showings in subsequent stages of these proceedings."

Several months after denying the motion for summary adjudication, on its own motion the court ordered reconsideration and supplemental briefing. The court then granted summary adjudication for Truck. In doing so, it noted that California courts had not decided the issue before it, but said that the trend nationally is that "insofar as asbestos coverage cases are concerned, the underlying cause test mandates a finding that either the manufacture and sale of asbestos-containing products was the single occurrence or that the failure to warn of asbestos-containing products was the single occurrence." Thus, the court said, its decision to apply an "underlying cause test" required it to

conclude that Truck and Kaiser reasonably intended to treat all asbestos bodily injury claims as a single occurrence under the policies.

Additionally, the court said, there were significant practical problems with the approach of its prior order: "Practically speaking, the roadblock in finding there were multiple occurrences based on the number of products Kaiser produced is the difficulty (if not impossibility) in proving *which products* resulted in exposure to the individual claimants. There also would be no reliable way to determine what amounts paid to claimants could be allocated to a particular Kaiser product. The complaints described in the claims matrix for the underlying ABIC illustrate this point. The underlying ABIC generally do not attempt to link any claimant's asbestos injuries with any specific Kaiser product or batch of products. Under these circumstances, coverage under the policies could likely *never* be determined and [Kaiser] would be without the insurance for which it bargained." (Fn. omitted.)

The court concluded: "Upon reconsideration, the Court finds, as a matter of law, that the manufacture and decision to place asbestos into products by the Kaiser entities constituted a single occurrence under the applicable policies. Accordingly, the Court finds that Truck's primary policies have been exhausted, and grants Truck's motion for summary adjudication."

LMI filed a timely petition for writ of mandate. We issued an order to show cause, ordered additional briefing and stayed all proceedings until further order of this court.

## LEGAL STANDARDS

A party is entitled to summary adjudication of a cause of action if there is no triable issue of material fact and the matter can be adjudicated as a question of law. (Code Civ. Proc., § 437c, subds. (c), (f)(1).) As with a motion for summary judgment, the court must view the evidence and reasonable inferences from the evidence in the light most favorable to the opposing party. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493]; *Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1155 [42 Cal.Rptr.3d 191].) On appeal, we independently review the trial court's ruling and apply the same legal standard that governs the trial court. (*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 678 [38 Cal.Rptr.3d 36]; *Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517].)

Although insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.

*(Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868 [77 Cal.Rptr.2d 107, 959 P.2d 265]; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) Thus, the mutual intention of the contracting parties at the time the contract was formed governs. (Civ. Code, § 1636; *Foster-Gardner, Inc., supra,* 18 Cal.4th at p. 868.) We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. (Civ. Code, §§ 1639, 1647; *American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1245 [37 Cal.Rptr.3d 918].) We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation. (Civ. Code, § 1641; *American Alternative Ins. Corp., supra,* 135 Cal.App.4th at p. 1245.) We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. (Civ. Code, § 1644; *American Alternative Ins. Corp., supra,* 135 Cal.App.4th at p. 1245.)

A policy provision is ambiguous if it is capable of two or more reasonable constructions. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) In determining if a provision is ambiguous, we consider not only the face of the contract but also any extrinsic evidence that supports a reasonable interpretation. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37, 39–40 [69 Cal.Rptr. 561, 442 P.2d 641].) Even apparently clear language may be found to be ambiguous when read in the context of the policy and the circumstances of the case. (*American Alternative Ins. Corp. v. Superior Court, supra,* 135 Cal.App.4th at p. 1246, citing *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 652 [3 Cal.Rptr.3d 228, 73 P.3d 1205].)

If policy language is ambiguous, an interpretation in favor of coverage is reasonable only if it is consistent with the objectively reasonable expectations of the insured. (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1265.) Thus, the court must determine whether the coverage under the policy that would result from such a construction is consistent with the insured's objectively reasonable expectations. (*Nissel v. Certain Underwriters at Lloyd's of London* (1998) 62 Cal.App.4th 1103, 1111–1112 [73 Cal.Rptr.2d 174].)

## DISCUSSION

The meaning of "occurrence" as it applies to asbestos injuries is an issue of first impression in this state. Other states have considered the question, but

they have reached varying conclusions. Some courts have held that "occurrence" in the asbestos-exposure context means the manufacturer's decision to incorporate asbestos into its products, and thus they have concluded that all asbestos injuries for which a defendant is responsible result from a single "occurrence." (E.g., *Greene, Tweed & Co., Inc. v. Hartford Acc. & Indem. Co.* (E.D.Pa., Apr. 21, 2006, Civ. No. 03-3637) 2006 WL 1050110 at pp. *3–*9; *Liberty Mut. Ins. Co. v. Treesdale, Inc.* (3d Cir. 2005) 418 F.3d 330, 334–339; *Westinghouse Elec. Corp. v. American Home Assurance Co.* (N.J.Super.Ct., July 8, 2004, Nos. A-6706-01T5 & A-6720-01T5) 2004 WL 1878764 at pp. *27–*32; *U.S. Gypsum Co. v. Admiral Insurance Co.* (1994) 268 Ill.App.3d 598 [205 Ill.Dec. 619, 643 N.E.2d 1226, 1257–1260]; *Owens-Illinois, Inc. v. United Ins. Co.* (1993) 264 N.J. Super. 460 [625 A.2d 1, 21–23]; *Colt Industries Inc. v. Aetna Cas. & Sur. Co.* (E.D.Pa., Dec. 6, 1989, Civ. A. No. 87-4107) 1989 WL 147615 at pp. *5–*6; *Air Products & Chemicals v. Hartford Acc. & Indem.* (E.D.Pa. 1989) 707 F.Supp. 762, 772–774; *Owens-Illinois, Inc. v. Aetna Cas. and Sur. Co.* (D.D.C. 1984) 597 F.Supp. 1515, 1524–1528.) Other courts have held that the "occurrence" is the claimant's unique asbestos exposure, and thus that each exposure is a separate occurrence. (E.g., *In re Prudential Lines Inc.* (2d Cir. 1998) 158 F.3d 65, 79–83; *Commercial Union Ins. Co. v. Porter Hayden Co.* (1997) 116 Md.App. 605 [698 A.2d 1167]; *Stonewall Ins. Co. v. Asbestos Claims Management* (2d Cir. 1995) 73 F.3d 1178, 1212–1214; *Cole v. Celotex Corp.* (La.App. 1991) 588 So.2d 376, 390–391.) Still other courts have said that the "occurrence" is the asbestos exposure, but have held that claimants who were exposed to asbestos at approximately the same time and place were injured by the same "occurrence." (E.g., *Fina, Inc. v. Travelers Indem. Co.* (N.D.Tex. 2002) 184 F.Supp.2d 547, 549–553; *Metropolitan Life Ins. Co. v. Aetna Cas. & Sur. Co.* (2001) 255 Conn. 295 [765 A.2d 891, 896–909].)

Notwithstanding their profusion, none of the preceding opinions engages in the "thorough examination of the policy language" California law requires. (*TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27 [50 Cal.Rptr.3d 597, 145 P.3d 472].) Moreover, the insurance contracts in those cases differ from the present contracts in significant ways, and while we recognize that consistent interpretation of standardized terms in insurance contracts promotes clear understanding of future contracts, it "would be foolish . . . to state as a matter of law that the word 'occurrence' . . . has the same meaning in all insurance contracts." (*Flintkote Co. v. General Acc. Assur. Co.* (N.D.Cal. 2006) 410 F.Supp.2d 875, 887.) Therefore, although we have carefully reviewed the out-of-jurisdiction cases cited by the parties, we do not rely on them to any significant degree, but instead construe the insurance contracts solely on the basis of the policy language.

# I

## THE APPLICABLE POLICY PROVISIONS

Truck issued CGL policies to Kaiser over 19 policy periods, from 1964 to 1983. An initial version of the CGL policy was in effect from 1964 to 1973, and a second version was in effect from 1974 to 1983. The policy provisions relevant to the present petition are described below.

### A. *The First Policy: 1964–1973*

The CGL policy in effect from 1964 to 1973 (the 1964 policy) provided coverage for "all sums which the Insured shall become legally obligated to pay as damages because of . . . bodily injury." It further defined the scope of the coverage as follows.

*Liability limits.* The 1964 policy limited Truck's liability for bodily injury to $100,000 "each person," $300,000 "each occurrence," and $300,000 "aggregate Products." With regard to the "each occurrence" limit, it further provided that "The limit of such liability stated in the Declarations as applicable to 'each occurrence' is, subject to the above provision respecting each person, the total limit of the Company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by two or more persons in any one occurrence." With regard to the "aggregate Products" limit, it provided that "The limits of Bodily Injury liability and Property Damage liability stated in the Declarations as 'aggregate products' are respectively the total limits of the Company's liability for all damages arising out of the products hazard during the twelve-month period beginning with the effective date of the products hazard coverage . . . ."

Effective January 30, 1971, the parties eliminated the aggregate product liability limit. The policy continued to contain a "per occurrence" limit, which was increased to $500,000.

*Deductible.* Under the 1964 policy, Kaiser was responsible for the first $5,000 of loss for "each occurrence . . . regardless of the number of claims emanating therefrom." A later policy, effective January 1, 1968, retained the $5,000 per occurrence deductible, but added an additional $15,000 products hazard deductible.

*"Occurrence."* The policy defined "occurrence" as "an event or series of events or continuous or repeated exposure to conditions which results in legal

liability, regardless of the number of persons, vehicles or objects affected by such act or acts or omission. As respects the Products Hazard, an occurrence shall be deemed to have taken place at the time of the injury or damage to the claimant and not at the time of the act of the Insured giving rise to liability."

*Aggregation of claims.* The policy provided for aggregating claims as follows: "All . . . damages arising out of one lot of goods or products prepared or acquired by the Named Insured or by another trading under his name shall be considered as arising out of one occurrence."

*Policy period.* The policy applied "only to occurrences which occur during the policy period."

### B. *The Second Policy: 1974–1983*

The parties made fundamental changes to the CGL policy in 1974. The relevant provisions of the policies in effect from 1974 to 1983 (the 1974 policy) are as follows.

*Liability limits.* The 1974 policy contained a $500,000 "per occurrence" liability limit. Like its immediate predecessor, it did not contain any aggregate limit, but instead provided that "There is no limit to the number of occurrences for which claims may be made hereunder, however, the limit of the Company's liability as respects any occurrence involving one or any combination of the hazards or perils insured against shall not exceed the per occurrence limit designated in the Declarations."

The parties restored aggregate limits effective April 1, 1980. The $1.5 million aggregate limit was "the total limit[] of the Company's liability for all damages arising out of the products hazard and completed operations hazard during the twelve month period beginning with the effective date of such coverage provided the personal injury or property damage occurs while the policy is in force." This change did not affect the per occurrence limit, which remained $500,000.

*Deductible.* The 1974 policy imposed a deductible of $5,000 for "each occurrence." A January 1, 1976 endorsement increased the deductible to $50,000 per occurrence. In April 1981, the deductible was increased again, to $100,000 per occurrence.

*"Occurrence."* The policy defined "occurrence" as "an event, or continuous or repeated exposure to conditions which results in personal injury or property damage during the policy period."

*Aggregation of claims.* The policy provided that "All such exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed one occurrence."

*Policy period.* The policy applied "only to occurrences during the policy period."

## II

## THE CGL POLICIES ARE NOT REASONABLY SUSCEPTIBLE OF THE CONCLUSION THAT ALL ASBESTOS BODILY INJURY CLAIMS RESULTED FROM ONE "OCCURRENCE" OR THAT THE POLICIES ARE EXHAUSTED AS A MATTER OF LAW

There is no dispute between the parties regarding the limits of Truck's liability for asbestos injuries sustained from 1964 to January 1971 or April 1980 to 1983, when the policies contained aggregate limits—i.e., limits on Truck's total liability for "all damages arising out of the products hazard and completed operations hazard during the [policy year]." The sole dispute, instead, concerns liability limits between January 1971 and April 1980, when the policies did *not* contain any aggregate limits. Because during those years the only limitation on Truck's liability was the "per occurrence" limit, Truck's potential liability for asbestos injuries is a direct function of the number of "occurrences" deemed responsible for those injuries.

Kaiser and Truck contend, as the trial court concluded, that the relevant "occurrence" is Kaiser's manufacture and distribution of asbestos products, which they contend is either an "event" or "exposure to conditions." They urge that all claimants' asbestos bodily injury claims result from a single "occurrence," i.e., "the continuous use of asbestos in a number of Kaiser's products without warning."

LMI contends, instead, that the relevant "occurrence" is injurious exposure to asbestos. Further, LMI urges that each claimant's asbestos injury necessarily results from a separate occurrence because "[t]he alleged asbestos injuries at issue were proximately caused by exposures to Kaiser products that took place at different times, at different places, and under different circumstances."

For the reasons that follow, we conclude that, as used in these policies, "occurrence" means injurious exposure to asbestos. We further conclude that all asbestos exposures cannot be treated as a single "occurrence" under the

aggregation provisions. However, on the present record we cannot determine how many occurrences are responsible for the tens of thousands of claims asserted against Kaiser; thus, we do not conclude, as LMI urges us to do, that each injurious exposure to asbestos necessarily is a separate occurrence.

A. *The "Occurrence" Is Each Claimant's Asbestos Exposure, Not Kaiser's Manufacture and Distribution of Asbestos Products*

1. *The Policy Language Defining "Occurrence"*

The policies define "occurrence" in the disjunctive: an event *or* continuous or repeated exposure to conditions. Thus, to be an "occurrence," Kaiser's manufacture and distribution of asbestos products must be either an "event" or "exposure to conditions." As we now explain, it is neither.

*"An event."* Real parties in interest suggest that "event" is a "broad[] term[]" that properly includes " 'anything that happens.' " Thus, they contend, Kaiser's "intentional act[]" of including asbestos in its products is an "event" within the policy language.

 We do not agree. As LMI correctly notes, the plain meaning of "event" is a discrete happening that occurs at a specific point in time. (E.g., Random House Webster's College Dict. (1992) p. 463 [event: "something that occurs in a certain place during a particular interval of time"].) Thus, for example, while an explosion or series of related explosions is an "event" or "series of events," 30 years of manufacturing activities cannot properly be so characterized.

This plain meaning analysis is reinforced by the drafting history of the form CGL policies from which Truck's policies were derived. The history, "while not determinative, may properly be used by courts as an aid to discern the meaning of disputed policy language." (*MacKinnon v. Truck Ins. Exchange, supra,* 31 Cal.4th 635, 653.) Before the 1960's, the form CGL policy provided coverage for injuries "caused by accident." (16 Appleman on Insurance 2d (Holmes ed. 1996) § 117.1, p. 206; see 9A Couch on Insurance (3d ed. 2005) § 129:3, p. 129-9.) The underwriting intent of the "caused by accident" policies, as explained by the legal committee of the National Bureau of Casualty Underwriters (NBCU), was to " 'require one identifiable event' " to trigger coverage. (Robinson, *The Best of Intentions: Drafting the 1966 Occurrence, and 1973 Pollution Exclusion Policy Language,* Practicing Law Inst. Commercial Law and Prac. Course Handbook Series (1994) 690 PLI/Comm. 565, 578–579 (Robinson, *The Best of Intentions*).) In other words, the drafters intended the "caused by accident" policies to cover traditional traumatic injury cases, but not to cover injuries from continuous or

repeated exposure to conditions: " '[C]aused by accident policy language is designed to include sickness and disease from an identifiable event (such as typhoid resulting from drinking contaminated water), but not to include sickness and disease from exposure over periods of time and which is not attributable to an identifiable event (such as silicosis), and usually would be so interpreted.' " (*Id.* at p. 579, quoting minutes of Nov. 2, 1939 meeting of NBCU legal committee.)

In the early 1940's, the joint forms committee, a joint committee of the NBCU and the Mutual Insurance Rating Bureau, issued a memorandum recommending that "caused by accident" policies be endorsed to include coverage for continuous or repeated exposure bodily injury claims. (Robinson, *The Best of Intentions, supra,* 690 PLI/Comm. at pp. 575–576, 580.) Consistent with that recommendation, the NBCU promulgated an exposure endorsement in 1950. (*Id.* at p. 581.) The endorsement substituted "occurrence" for "accident," and it defined "occurrence" using language nearly identical to the language of the Truck/Kaiser policy: " ' "Occurrence" means an event, or continuous or repeated exposure to conditions, which unexpectedly causes injury during the policy period.' " (*Id.* at p. 582.)

■ Based on the plain meaning of the policy language, bolstered by the drafting history, we conclude that the parties did not understand or intend "event" to mean " 'anything that happens,' " including "the conscious inclusion of asbestos in products manufactured and distributed by the policyholder." If the parties had so intended, the "continuous or repeated exposure" clause would have been entirely superfluous, because any "exposure" for which a policyholder could be held liable necessarily would result from an "event." (See *Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 503 [30 Cal.Rptr.3d 787, 115 P.3d 68] [effect of Civ. Code, § 1641, "is to disfavor constructions of contractual provisions that would render other provisions surplusage"]; *Farmers Ins. Exchange v. Knopp* (1996) 50 Cal.App.4th 1415, 1421 [58 Cal.Rptr.2d 331] ["contracts, including insurance contracts, are to be construed to avoid rendering terms surplusage"].) Instead, we conclude that the parties intended "event" to mean an identifiable, single injury-causing episode—an "accident" under the older CGL form—as distinct from "continuous or repeated exposure."

Manufacture and distribution of asbestos products over 30 years cannot reasonably be characterized as an "event," as we understand that term to have been used in the policies, because it is not a single episode. Instead, it is an ongoing course of conduct. Accordingly, the "event" prong of the occurrence definition does not apply here.

*"Exposure to conditions."* Real parties in interest contend, alternatively, that Kaiser's manufacture and distribution of asbestos products is "continuous

or repeated exposure to conditions" and, thus, is an "occurrence" under the policies. We do not agree. It unreasonably strains the plain language of the policies to characterize manufacture and distribution of products as "conditions" to which claimants were exposed. We find persuasive the reasoning expressed by two trial courts that interpreted similar policy language in asbestos-related litigation. (See *Coordinated Asbestos Ins. Coverage Cases* (Super. Ct. S.F. City and County, Jan. 25, 1990, JCCP No. 1072) ["It unreasonably strains the plain language of the policy to characterize asbestos products which were shipped from Fibreboard plants as 'conditions' "]; see also *Fina, Inc. v. Travelers Indem. Co., supra,* 184 F.Supp.2d at p. 552 ["[I]t is difficult to accept the contention that a failure to protect [from the dangers of asbestos] was a 'condition' to which all claimants were repeatedly or continuously 'exposed.' Such an interpretation places considerable strain on the plain and ordinary meaning of the terms 'condition' and 'exposure' "].) Contrary to real parties in interest, we conclude that the "conditions" to which claimants were exposed were the asbestos fibers released from Kaiser's products. This interpretation does not strain the policy language. To the contrary, it is the most natural reading of that language.

### 2. *Other Policy Provisions*

In addition to the "occurrence" definition, other provisions of the CGL policies—which we properly consider, because contractual language " ' "must be construed in the context of that instrument as a whole" ' " (*Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra,* 18 Cal.4th at p. 868)—reinforce the conclusion that "occurrence" means claimants' asbestos exposure, not Kaiser's manufacture or distribution of asbestos products.

***The products hazard definition.*** The 1964 policy defined "products hazard" as "goods or products manufactured, sold, handled or distributed by the Named Insured or by others trading under his name, if the occurrence or accident occurs after possession of such goods or products has been relinquished to others by the Named Insured or by others trading under his name and if such occurrence or accident occurs away from premises owned, rented or controlled by the Named Insured."

As used in this clause, neither manufacture nor distribution can be an "occurrence" because both necessarily occur *before*—not *after*—a product is relinquished by the manufacturer or distributor. Indeed, it is difficult to understand in what sense a product is "a product" prior to its manufacture. No such challenges are presented if "occurrence" means an injury-causing event, because such an event logically can occur away from the manufacturing premises after a product has been purchased.

*The products hazard deemer.* The 1964 policy provided that "As respects the Products Hazard, an occurrence shall be deemed to have taken place at the time of the injury or damage to the claimant and not at the time of the act of the Insured giving rise to liability." This clause is unintelligible if the "occurrence" is the manufacture of the injury-causing product, because the manufacture could take place "at the time of the injury" only if the injury happened during the manufacturing process. As we have just noted, however, manufacturing injuries are *excluded* from the policy's definition of "products hazard," which embraces only injuries that occur away from the insured's premises after possession of such goods or products has been relinquished to others.

*The timing clause.* The 1974 policy applied "only to occurrences during the policy period" that "result[ed] in personal injury or property damage during the policy period." In other words, there was coverage only where both the *occurrence* and the *injury* occurred in the same policy period.

■ Interpreting "occurrence" to mean the "manufacture and distribution of asbestos-containing products" would create significant coverage gaps because there would be no coverage for injuries caused in *one* policy period by products manufactured in *a prior* policy period. Such gaps are fundamentally inconsistent with a "comprehensive" (or "ultra comprehensive") liability policy, and real parties in interest have not cited any evidence that the parties intended such gaps. (See *MacKinnon v. Truck Ins. Exchange, supra,* 31 Cal.4th 635, 654 [purpose of CGL policies is " ' "to provide the insured with the broadest spectrum of protection against liability for unintentional and unexpected personal injury or property damage arising out of the conduct of the insured's business" ' "].)

In contrast, interpreting "occurrence" to mean asbestos exposure eliminates these gaps because it provides coverage during every policy period in which injury occurs, regardless of when the product was manufactured. This interpretation thus is consistent with the kind of "comprehensive" coverage we believe Kaiser thought it was purchasing and Truck thought it was providing.

*The notice clause.* Both versions of the policy require that in the event of an occurrence, "written notice shall be given by or on behalf of the Insured to the Company . . . as soon as practicable after the manager of the insurance department of the Named Insured has knowledge of an event or occurrence which, in [his or her] opinion . . . is likely to result in a claim under this policy." Such notice "shall contain particulars sufficient to identify the Insured and also reasonably obtainable information respecting the time, place and circumstances of the occurrence, and name and address of the injured and of available witnesses."

As another court has noted with reference to a similar policy, this provision uses "occurrence" "in the sense of 'accident': an unforeseen event that causes injury to one or more persons, or to property." (*Flintkote Co. v. General Acc. Assur. Co.*, *supra*, 410 F.Supp.2d at p. 892.) Manufacture and distribution of asbestos products is not an unforeseen event, but rather is "better characterized as [a] business decision[]." (*Ibid.*) It would be nonsensical to require Kaiser to provide "written notice . . . as soon as practicable" of its business decision to sell asbestos, and it would be equally nonsensical to require Kaiser to provide the "time, place and circumstances" of its asbestos manufacturing or the "name and address" of "witnesses" to such manufacturing. Moreover, only a seer would be able to determine that the manufacturing of a product is "likely to result in a claim" under a particular insurance policy.

***The assistance and cooperation clause.*** The policies provide that "The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense, except . . . for emergency medical and surgical relief to others at the time of the occurrence." Implicit in this clause is the parties' expectation that an "occurrence" may cause injuries requiring medical or surgical attention. It thus reinforces our conclusion that the parties understood "occurrence" to mean an injury-producing event, not routine manufacture or distribution.[3]

### 3. *California Law*

Real parties in interest urge that notwithstanding the policy language, "occurrence" must mean Kaiser's manufacture and distribution of asbestos products because California law defines "occurrence" as the underlying or remote cause of an alleged injury, not the immediate cause. Thus, they suggest, because Kaiser's manufacturing and distribution is "the single underlying cause of [asbestos bodily injury claims]," it necessarily is the relevant "occurrence."

We do not agree. As we have said, under California law our primary guide to determining the obligations created by insurance contracts is the language of the contracts themselves. (*TRB Investments, Inc. v. Fireman's Fund Ins. Co.*, *supra*, 40 Cal.4th at p. 27 [intent of the parties to an insurance contract

---

[3] In the trial court and in this proceeding, real parties in interest cited extrinsic evidence that they contended supported their interpretation of the relevant policies. We have not considered that evidence here. "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.*, *supra*, 69 Cal.2d at p. 37.) Because we have concluded that the policy language is not reasonably susceptible of real parties in interest's proffered interpretation, the extrinsic evidence real parties in interest offer is not relevant to our analysis.

is " 'to be inferred, if possible, solely from the written provisions of the contract' "]; *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253] [same].) Thus, even if other courts had held that "occurrence" means "underlying cause" in other insurance contracts with different provisions, those holdings would be largely irrelevant to our decision.

Moreover, nearly every case real parties in interest cite was decided long after the present policies were entered.[4] As a result, those cases could not have informed the parties' understanding of "occurrence" when they entered into the policies and, thus, they are not material to our determination. (E.g., *TRB Investments, Inc. v. Fireman's Fund Ins. Co.*, supra, 40 Cal.4th at p. 27 [" 'Under statutory rules of contract interpretation, the mutual intention of the parties *at the time the contract is formed* governs interpretation' " (italics added)]; *Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 979 [41 Cal.Rptr.3d 48], citing Civ. Code, § 1636 [" 'The basic goal of contract interpretation is to give effect to the parties' mutual intent *at the time of contracting*' " (italics added)]; *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 645–646 [51 Cal.Rptr.2d 907] [events long after parties' divorce "had no relevance to the question of what the parties intended by the language used in their 1969 settlement agreement and judgment"]; *Thomas v. Buttress & McClellan, Inc.* (1956) 141 Cal.App.2d 812, 816 [297 P.2d 768] ["The intent of the parties to a contract is to be ascertained as of the time the contract was made, not some later date. [Citations.] Subsequent unforeseen events cannot be allowed to control in arriving at that intent."].)

Finally, contrary to real parties in interest's contentions, none of the cited cases stands for the proposition that "occurrence" necessarily means "remote" cause of injury, rather than immediate cause. It is true, as real parties in interest urge, that several California cases have held "occurrence" means the "cause" (or "underlying cause") of an injury, not the injury or claim itself. (E.g., *Caldo Oil Co. v. State Water Resources Control Bd.* (1996) 44

---

[4] The sole exception, *Hyer v. Inter-Insurance Exchange, etc.* (1926) 77 Cal.App. 343 [246 P. 1055]—which interpreted "accident," not "occurrence," and did so in the context of two closely related automobile accidents—does not come close to standing for the sweeping proposition that "occurrence" necessarily means underlying cause. There, a driver negligently collided first with one car and then, immediately thereafter, with a second car. The court did *not* conclude, as real parties in interest suggest, that "when determining whether multiple injuries or claims arose from one or more occurrences, California courts look to the conduct of the insured which caused/gave rise to liability." All it held was that the per accident policy limit applied because the injuries resulted from a "continuous sequence of events": "Here the assured's liability to the owner of each of the two automobiles damaged in the collisions accrued from one act of negligence on the part of the assured's servant, namely, the negligent operation of the Marmon car which caused it to collide first with the Overland and then with the Cadillac. This act of negligence, the one cause which set in motion all that followed, was the proximate cause of both collisions." (*Id.* at pp. 351, 346–347.)

Cal.App.4th 1821, 1828 [52 Cal.Rptr.2d 609]; *Whittaker Corp. v. Allianz Underwriters, Inc.* (1992) 11 Cal.App.4th 1236, 1242–1243 [14 Cal.Rptr.2d 659].) But these cases do not consider whether "occurrence" means *remote cause* (manufacture of asbestos products) or *immediate cause* (exposure to asbestos fibers), and thus they do not guide our decision.[5]

*State Farm Fire & Casualty Co. v. Elizabeth N.* (1992) 9 Cal.App.4th 1232 [12 Cal.Rptr.2d 327], for example, considered the limits of an insurer's liability for damages suffered by three children who were repeatedly molested while in the care of the insured, a daycare provider. Although there, as here, the central issue was how many "occurrences" caused claimant's injuries, the court had no occasion to decide whether "occurrence" meant "remote" or "immediate" cause because the parties stipulated that the "occurrence" was the insured's asserted negligent supervision—the "remote" cause of injury— not the "immediate" acts of molestation. (*Ibid.*)

*Whittaker Corp. v. Allianz Underwriters, Inc., supra,* 11 Cal.App.4th 1236, also does not support real parties in interest's contention that "occurrence" means remote cause. Indeed, *Whittaker* is not an "occurrence" case at all. The only issue there was which of several CGL policies was triggered by a series of related products liability claims. That issue, the court explained, was entirely distinct from the number of occurrences: "The *number* of relevant occurrences for the purpose of interpreting the per occurrence limitation of liability is different from the question of *when* the relevant occurrence happens for the purpose of determining if there is coverage at all, or whether coverage should be allocated to a particular policy period." (*Id.* at p. 1242.)

*EOTT Energy Corp. v. Storebrand Internat. Ins. Co.* (1996) 45 Cal.App.4th 565 [52 Cal.Rptr.2d 894] (*EOTT*) arguably comes the closest to equating "occurrence" with "remote cause," but it too is not decisive. There, the insured suffered a $1.5 million loss as the result of over 650 thefts of its petroleum products. (*Id.* at p. 568.) The insurer asserted that each theft was a separate "occurrence," while the insured contended that the multiple thefts were part of an organized conspiracy and, thus, constituted a single occurrence. (*Id.* at pp. 568–571.) The Court of Appeal reversed the trial court's grant of summary judgment for the insurer, holding that it could not conclude, as a matter of law, that there were multiple occurrences. (*Id.* at p. 578.) It noted that the policy did not define "occurrence" and that the term must be interpreted consistent with the insured's objectively reasonable expectations. (*Id.* at p. 575.) It concluded:

---

[5] We echo the observation of the *Flintkote* court that "the finding that 'occurrence' in the context of asbestos-related injuries refers to an exposure to asbestos fibers does not eliminate the distinction drawn in the policy between occurrences and injuries. . . . [A]n exposure to asbestos fibers is not an injury; rather, the harm done to the body as a result of the exposure is the injury." (*Flintkote Co. v. General Acc. Assur. Co., supra,* 410 F.Supp.2d at p. 894.)

"In our view, EOTT's objectively reasonable expectation would embrace the conclusion that multiple claims, all due to the same cause or a related cause, would be considered a single loss to which a single deductible would apply." (*Ibid.*) Although *EOTT* thus holds that "occurrence" can mean underlying cause, it does not suggest that it necessarily has that meaning. To the contrary, the case is clear that it "must interpret the term 'occurrence' 'in context, *with regard to its intended function in the policy.*' " (*EOTT, supra*, 45 Cal.App.4th at p. 575, italics added.)[6]

Therefore, none of the cases real parties in interest cite holds, as they suggest, that "when determining whether multiple injuries or claims arose from one or more occurrences, California courts look to the conduct of the insured which caused/gave rise to liability." Indeed, none of these cases purports to do anything more than interpret the language of the particular policies at issue, as California law requires. They do not alter our conclusion that as used in the present CGL policies, "occurrence" means asbestos exposure that results in bodily injury, not Kaiser's manufacture and distribution of asbestos products.

> B. *The Plain Language of the Policies Precludes Treating All Claimants' Asbestos Exposure as Resulting from a Single "Occurrence"*

For the reasons discussed in the prior section, we cannot agree with the trial court that, as a matter of law, "occurrence" means Kaiser's manufacture and distribution of asbestos products. That conclusion is not fully dispositive of the present petition, however, because "[a]lthough the trial court may grant summary judgment on one basis, this court may affirm the judgment under another[;] . . . it reviews the ruling, not the rationale." (*Salazar v. Southern Cal. Gas Co.* (1997) 54 Cal.App.4th 1370, 1376 [63 Cal.Rptr.2d 522]; see also *Modern Development Co. v. Navigators Ins. Co.* (2003) 111 Cal.App.4th 932, 938 [4 Cal.Rptr.3d 528], citing *Lucas v. Pollock* (1992) 7 Cal.App.4th 668, 673 [8 Cal.Rptr.2d 918] ["We must affirm the judgment if it is correct under any theory of law applicable to the case"].)

---

[6] None of the other cases real parties in interest cite suggests that California applies a "remote cause" test. *Chemstar, Inc. v. Liberty Mut. Ins. Co.* (C.D.Cal. 1992) 797 F.Supp. 1541, 1546–1547, affirmed (9th Cir. 1994) 41 F.3d 429, held that "occurrence" meant the "cause" of homeowners' property damage claims, not the property damage itself, but it did not address the "remote" or "immediate" cause question. *State Farm Fire & Cas. Co. v. Kohl* (1982) 131 Cal.App.3d 1031 [182 Cal.Rptr. 720] is even farther afield. There, the court held that an insured was covered by both his automobile and homeowner's policies for claims that he negligently caused a motorcycle accident and then further injured the victim by negligently dragging her from the street (*id.* at p. 1039); it has no application to the present petition.

Therefore, we now consider the second issue raised by the petition: Whether the policy language—specifically, the policies' aggregation provisions—permits the thousands of individual asbestos exposures to be deemed a single "occurrence." For the reasons that follow, we conclude that they cannot be so deemed.

### 1. *The "One Lot" Provision*

The sole aggregation provision of the 1964 policy provided that multiple injuries would be treated as resulting from a single occurrence if the injuries "ar[ose] out of one lot of goods or products prepared or acquired by the Named Insured or by another trading under his name." This provision is nearly identical to a form CGL provision promulgated by the NBCU prior to 1966, which was intended by the drafters to limit the insurer's liability for products claims. (Nachman, The New Policy Provisions for General Liability Insurance (June 1965) pp. 10–11 (New Policy Provisions).)[7]

This provision precludes treating all asbestos claims as a single "occurrence." On its face, the provision aggregates only injuries that result from "*one lot* of goods or products," not injuries from multiple product lots. There is absolutely no evidence that all of the asbestos claims against Kaiser derive from a single lot of asbestos products. Indeed, Kaiser concedes that they do not: "The ABIC claims against Kaiser *do not* arise out of one lot of Kaiser-manufactured products. Rather, they arise out of multiple products, made, packaged and distributed over many years."

Real parties in interest urge that the inapplicability of the "one lot" provision is not dispositive because it "[does not] purport[] to preclude a single occurrence for multiple claims" where it does not apply. We do not agree. If the policies could be read, as real parties in interest suggest, to permit aggregation of claims *whether or not* they are addressed by the policies' only aggregation provision, then that provision is meaningless: Any injuries could be deemed to result from a single occurrence, whether or not they result from "one lot of goods or products." Such an interpretation violates the well-established rule disfavoring constructions of contractual provisions that render other provisions surplusage. (See *Boghos v. Certain Underwriters at Lloyd's of London*, *supra*, 36 Cal.4th at p. 503 [effect of Civ. Code, § 1641, "is to disfavor constructions of contractual provisions that

---

[7] The NBCU eliminated this provision when it redrafted the form CGL policy in 1966. According to a principal drafter, the provision was eliminated because "The problem in many cases in determining what constituted one lot of goods or products made retention of this language untenable. Reliance will be placed upon the aggregate limit to establish a cut-off of coverage in the kind of catastrophic incidents where the batch clause had been expected to be effective." (New Policy Provisions, *supra*, p. 11.)

would render other provisions surplusage"]; *Farmers Ins. Exchange v. Knopp*, *supra*, 50 Cal.App.4th at p. 1421 ["contracts, including insurance contracts, are to be construed to avoid rendering terms surplusage"].)

Real parties in interest also suggest that the "one lot" provision does not apply here because it concerns only nonconforming products, not design defects. Real parties in interest do not identify anything in either the policy language or the drafting history that supports that interpretation. Instead, they contend only that it would make no sense to aggregate claims by "lot" where the alleged defects are not lot-specific, but instead infect multiple lots or multiple products. Perhaps not, but we cannot alter the language in a contract because we question its wisdom or efficacy. The "lot" terminology, in hindsight, may not have been a desirable way to aggregate product defect claims—especially in the case of defects of the magnitude presented by the present asbestos claims—but it is the language the contracting parties chose. We cannot rewrite it. (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 392 [33 Cal.Rptr.3d 562, 118 P.3d 589] [" 'we do not rewrite any provision of any contract, including the standard policy underlying any individual policy, for any purpose' "]; *Rodriguez v. American Technologies, Inc.* (2006) 136 Cal.App.4th 1110, 1122 [39 Cal.Rptr.3d 437] ["While we may question the wisdom of the parties' choice, . . . the parties were free to choose their [contractual provisions]. The court will not rewrite their contract."]; *Wyandotte Orchards, Inc. v. Oroville-Wyandotte Irrigation Dist.* (1975) 49 Cal.App.3d 981, 986–987 [123 Cal.Rptr. 135] ["the courts cannot rewrite a contract to avoid difficulty or hardship"].)

Our conclusion that the "one lot" clause applies equally to nonconforming products and design defects is not altered by the court's contrary conclusion in *Diamond Shamrock Chemicals v. Aetna* (1992) 258 N.J. Super. 167 [609 A.2d 440, 480]. There, the court acknowledged that similar policy language did not on its face exclude design defects, but it concluded that such an exclusion nonetheless should be read into the language. According to the court: "The intent of the parties in adding the batch clause to the policies was to minimize the number of occurrences in order to maximize coverage. If the batch clause is interpreted to require aggregation of deductibles to correspond with the number of lots distributed, it will run counter to the parties' intent." (*Ibid.*)

We do not agree with the court's analysis. While it is indisputable that the parties intended by the "one lot" clause to aggregate claims *in some fashion*, it does not follow that the parties intended that claims would be aggregated to most effectively limit the insurer's liability. Rather, the clause's language

suggests that the parties intended to aggregate only *some* claims—i.e., those arising out of "one lot of goods or products."[8]

## 2. *The "Same General Conditions" Provision*

The 1974 policy eliminated the "one lot" provision and replaced it with the following: "All . . . exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed one occurrence." This provision is not reasonably susceptible of the conclusion that all asbestos claims against Kaiser resulted from one occurrence: Since the Kaiser products at issue were manufactured at 10 different facilities at various times, we cannot reasonably conclude that they "emanated from" a single premises location.

As with the "one lot" clause, real parties in interest contend that the "same general conditions" clause is not exclusive, and thus that multiple claims may be treated as resulting from a single occurrence even if they are not within that clause. According to real parties in interest, to conclude that claims cannot be deemed to result from a single occurrence unless they emanate from the same premises location "necessarily adds the phrase[] 'and no other situation shall constitute one occurrence.' The clause does not say that, nor can it reasonably be read to impliedly include such a limitation—at least not without rewriting the clause and changing its purpose." Again, we cannot agree. If the policies can be read to permit aggregation of claims *whether or not* they result from "exposure to substantially the same general conditions existing at or emanating from each premises location," then the provision is reduced to surplusage, in violation of established California contract interpretation rules.

Real parties in interest also contend that the "same general conditions" clause applies only to premises coverage, not products liability coverage, and thus is inapplicable here. This interpretation is not required by the plain language of the clause and real parties in interest suggest no extrinsic support for it. In any event, even if the clause does not apply to products claims, real parties in interest fare no better because no other provision of the insurance contracts permits aggregation of claims. Thus, were we to conclude that the "same general conditions" clause does not apply to the products liability claims against Kaiser, it would only reinforce our conclusion that those claims are not the result of a single "occurrence."

---

[8] By so concluding, we are not suggesting that the provision is unambiguous. To the contrary, we believe that the clause is ambiguous as applied to the facts of this case. (See *Home Ins. Co. v. Aetna Cas. & Sur. Co.* (2d Cir. 1976) 528 F.2d 1388 [material fact issues as to meaning of and intent behind "one lot" clause, precluding summary judgment].)

## CONCLUSION

■ For all the foregoing reasons, we conclude that the plain language of the policies is not susceptible of the conclusion that Kaiser's manufacture and distribution of asbestos products is an "occurrence." Rather, we find that the relevant "occurrence" is injurious exposure to asbestos products. Further, we find that the aggregation provisions preclude treating all asbestos exposure as resulting from a single annual occurrence. Thus, the grant of summary adjudication was improper.

We caution the parties, however, that by reversing the grant of summary adjudication we have not concluded, as LMI suggests, that the number of occurrences necessarily is equal to the number of asbestos claimants. As we have indicated, the number of "occurrences" turns on the meaning of the "one lot" clause in the 1964 policy, and the "same general conditions" clause of the 1974 policy—an issue we have not fully resolved.[9] Moreover, the present factual record is too limited to allow us to make any judgments about how the many claims against Kaiser should be aggregated.

In short, while it is clear that the policies anticipated that claims would be aggregated in some fashion, how the aggregation provisions apply will depend on the nature of the claims. The facts of each claim will determine whether the number of occurrences is limited by either the "one lot" clause or the "same general conditions" clause. On remand, it will be up to Truck to demonstrate to the trial court that these clauses apply to aggregate particular claims.

## DISPOSITION

Let a peremptory writ of mandate issue directing respondent superior court to vacate the January 10, 2006 order granting Truck's motion for summary

---

[9] We note that the relevant policy provisions apparently derived from standard policies promulgated by insurance industry bureaus in the 1940's through the 1960's. Although there appears to be a detailed drafting history of these provisions, the parties have not provided it to us or the trial court. (E.g., Anderson, *History of Disputed Provisions of the 1966 Standard Form Comprehensive General Liability Insurance Policy, Drafting History, Sales History and Historical Review of Commentators*, Practicing Law Inst. Litigation Administrative Prac. Course Handbook Series (1989) 369 PLI/Lit. 203, 213–214 ["The industry-wide organizations kept extensive minutes of deliberations, documentation of changes and suggested changes which are still in the [Insurance Services Office] files at its headquarters in New York and in the custody of its law firm in Chicago"]; Robinson, *The Best of Intentions, supra*, 690 PLI/Comm. 565, 585 [detailing drafting history as relevant to pollution exclusion].) The parties also have not provided us with evidence of any negotiations between Truck and Kaiser prior to the adoption of either policy. Thus, we do not have the benefit of extrinsic evidence that may be extremely helpful in determining what the disputed policy provisions mean.

adjudication and to enter a new order denying that motion. The stay is dissolved. The parties are to bear their own costs incurred in this writ proceeding.

Willhite, Acting P. J., and Manella, J., concurred.

A petition for a rehearing was denied January 26, 2007, and the petition of real parties in interest for review by the Supreme Court was denied May 9, 2007, S150310. Chin, J., did not participate therein.