PLASTICS ENGINEERING COMPANY,
Plaintiff-Appellee-Cross-Appellant,

v.

LIBERTY MUTUAL INSURANCE COMPANY,
Defendant-Appellant-Cross-Appellee.

Supreme Court

*No. 2008AP333–CQ. Oral argument September 9, 2008.
—Decided January 29, 2009.*

2009 WI 13

(Also reported in 759 N.W.2d 613.)

556

For the defendant-appellant-cross-appellee there were briefs by *Michael J. Cohen, Pamela J. Tillman,* and *Meissner Tierney Fisher & Nichols S.C.,* Milwaukee, and *John C. Sullivan* and *Post & Schell, P.C.,* Philadelphia, Pa., and oral argument by *John C. Sullivan.*

For the plaintiff-appellee-cross-appellant there were briefs by *Jeffrey O. Davis, Keith A. Bruett, William H. Harbeck, David A. Strifling,* and *Quarles & Brady LLP,* Milwaukee, and oral argument by *Jeffrey O. Davis.*

An amicus curiae brief was filed by *Heidi L. Vogt* and *von Briesen & Roper, S.C.,* Milwaukee, and *Laura A. Foggan, John C. Yang, Lena Mirilovic* and *Wiley Rein LLP,* Washington, D.C.

An amicus curiae brief was filed by *Thomas R. Schrimpf* and *Hinshaw & Culbertson LLP,* Milwaukee, on behalf of the Wisconsin Insurance Alliance.

An amicus curiae brief was filed by *Susan R. Tyndall* and *CMT Legal Group, Ltd.,* Waukesha, on behalf of London Market Insurers.

Amicus curiae briefs were filed by *Henry J. Handzel, Todd Palmer* and *DeWitt Ross & Stevens S.C.,* Madison; *Randy Paar* and *Dickstein Shapiro LLP,* New York, N.Y.; *Michael T. Sharkey* and *Dickstein Shapiro LLP,* Washington, D.C., on behalf of the Wisconsin Paper Council.

An amicus curiae brief was filed by *Karen M. Schapiro and Betsy Lawton,* Madison, on behalf of Midwest Environmental Advocates, Inc.

An amicus curiae brief was filed by *Paul G. Kent, Alan G. B. Kim, Jr.,* and *Anderson & Kent, S.C.,* Madison, and *Amy Back,* San Francisco, Cal., on behalf of United Policyholders.

An amicus curiae brief was filed by *Sarah C. Walkenhorst* and *Heller Ehrman LLP,* Madison, and *Mark J. Plumer* and *Heller Ehrman LLP,* Washington, D.C., on behalf of the Wisconsin Utilities Association.

An amicus curiae brief was filed by *William J. Mulligan, James E. Braza, Susan G. Schellinger,* and *Davis & Kuelthau, S.C.,* Milwaukee, on behalf of the National Federation of Independent Business (NFIB) Small Business Legal Center.

An amicus curiae brief was filed by *Todd A. Becker* and *Coyne, Schultz, Becker & Bauer, S.C.,* Madison, on behalf of the Transportation Insurance Company and the National Fire Insurance Company of Hartford.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is a certification of questions of law from the United States Court of Appeals for the Seventh Circuit, pursuant to Wis. Stat. § 821.01 (2005–06).[1] The questions certified for determination are: "(1) what constitutes an 'occurrence' in an insurance contract when exposure injuries are sustained by numerous individuals, at varying geographical locations, over many years; (2) whether Wisconsin Statute § 631.43(1) applies to successive insurance policies; and (3) whether Wisconsin courts would adopt an 'all sums' or pro rata allocation

---

[1] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

approach to determining liability when an injury spans multiple, successive insurance policies."

¶ 2. At the outset, we recognize that a certification usually, and appropriately so, contains questions of law that cannot be answered by controlling precedent from the Wisconsin Supreme Court or Court of Appeals. *See* Wis. Stat. § 821.01. In a certification, this court does not traditionally decide the issues as if we were reviewing the decision of the magistrate judge. The parties, however, did not brief or argue this case in response to the certified questions. Rather, they briefed and argued this case as if we were called upon to affirm or reverse Judge Goodstein's decision.[2]

¶ 3. The certification noted that "[h]ow these [policy] provisions are interpreted in the context of long-tailed exposure claims under Wisconsin law will significantly shape the future of insurance litigation in the state." Here we analyze the certified questions by turning to the specific policy language, which apparently is standard language found in other insurance contracts governed by Wisconsin law.[3] Wisconsin case law has not interpreted such a policy in light of these facts. Consequently, we answer these questions in a manner that could prove useful beyond the case now before the court.

¶ 4. We answer the three certified questions by concluding that under the language in this policy and the facts of this case, each claimant's repeated exposure

---

[2] Furthermore, when arguing before the Seventh Circuit Court of Appeals, the parties made nearly identical arguments.

[3] *See Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 514 F.3d 651, 660 (7th Cir. 2008) (stating that this contract language undoubtedly appears in other contracts governed by Wisconsin law).

is one occurrence; Wis. Stat. § 631.43(1) (1975–current)[4] does not apply to successive insurance policies; and once this policy is triggered, Liberty Mutual must fully defend the lawsuit in its entirety and pay for all sums up to the policy limits that Plastics Engineering Company (Plenco) is obligated to pay because of the injury. The policy language here does not support a pro rata allocation of damages.

## I. FACTS

¶ 5. Prior to filing motions for summary judgment at the United States District Court for the Eastern District of Wisconsin, the parties stipulated to the following facts:

¶ 6. From approximately 1950 until 1983, Plenco manufactured and sold certain compounds that incorporated asbestos. Plenco has now been named a defendant in a number of lawsuits because of bodily injury or wrongful death that are allegedly related to or have arisen from exposure to asbestos-containing products sold by Plenco. In general, the claimants allege that they were injured by their first exposure to asbestos, but their asbestos-related injuries did not manifest until long after their exposure to the asbestos. The claimants' exposures allegedly occurred at different times and at different geographical locations.

¶ 7. During periods of the alleged exposure and resulting injury, Liberty Mutual provided various insurance policies to Plenco. The policies relevant to this litigation are the primary policies from February 9,

---

[4] The language contained in Wis. Stat. § 631.43(1) has not been revised since its creation in 1975. Therefore, all subsequent references to this statute are to the 1975–current version unless otherwise indicated.

1968, through January 1, 1989, and the umbrella excess coverage policies from May 8, 1970, through January 1, 1984, and January 1, 1986, through January 1, 1988. In each of these years, Liberty Mutual was the insurer who issued the primary and excess policies.[5] Primary policies beginning January 1, 1989, and excess policies beginning January 1, 1988, contain an asbestos exclusion.

¶ 8. The policies at issue contained the following coverage limits: From February 9, 1968, through January 1, 1986, Liberty Mutual insured Plenco under a primary policy with coverage limits of $500,000 per occurrence and $500,000 annual aggregate. From January 1, 1986, through January 1, 1989, Liberty Mutual insured Plenco under a primary policy with coverage limits of $1,000,000 per occurrence and $1,000,000 annual aggregate.

¶ 9. From May 8, 1970, through January 1, 1984, Liberty Mutual also insured Plenco under umbrella excess liability policies. From May 8, 1970, through December 19, 1972, the coverage limits under each excess policy were $1,000,000 per occurrence and $1,000,000 annual aggregate. From December 19, 1972, through January 1, 1982, the coverage limits under each excess policy were $5,000,000 per occurrence and $5,000,000 annual aggregate. From January 1, 1982, through January 1, 1984, the coverage limits under each excess policy were $1,000,000 per occurrence and $1,000,000 annual aggregate. From January 1, 1984, through January 1, 1986, Liberty Mutual did not provide Plenco with umbrella excess liability coverage.

---

[5] While, according to the stipulated facts, Plenco purchased excess or umbrella excess policies from other insurers at times when it sold asbestos-containing products, those policies are not at issue in this litigation.

563

From January 1, 1986, through January 1, 1988, the coverage limits for each policy were $10,000,000 per occurrence and annual aggregate.

¶ 10. The primary policies issued by Liberty Mutual to Plenco from January 1, 1967, through January 1, 1989, contained the following or similar insuring clause:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> Coverage A. bodily injury or
>
> Coverage B. property damage
>
> to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

¶ 11. The primary policies provided the following definition for "bodily injury": From January 1, 1967, through January 1, 1973, the policies defined "bodily injury" as "bodily injury, sickness or disease sustained by any person." From January 1, 1973, through January 1, 1989, the primary policies defined "bodily injury" as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom."

¶ 12. The primary policies provided the following definition of "occurrence": From January 1, 1967,

through January 1, 1973, the primary policies defined "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." From January 1, 1973, through January 1, 1989, the primary policies defined "occurrence" using the following or similar language, "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

¶ 13. The primary policies from January 1, 1967, through January 1, 1973, provided the following Limits of Liability provision:

> Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage or (3) claims made or suits brought on account of bodily injury or property damage, the company's liability is limited as follows:
>
> Coverage A—The limit of bodily injury liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all damages because of bodily injury sustained by one person as the result of any one occurrence; but subject to the above provision respecting "each person", the total liability of the company for all damages because of bodily injury sustained by two or more persons as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to "each occurrence".
>
> . . .
>
> Coverages A and B—For purposes of determining the limit of the company's liability, all bodily injury and

565

property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

¶ 14. From January 1, 1973, through January 1, 1977, the Limits of Liability provision was substantially the same as the January 1, 1967, through January 1, 1973, provision.

¶ 15. The primary policies issued by Liberty Mutual from January 1, 1977, through January 1, 1984, contained a Combined Single Aggregate Limit of Liability Endorsement, and those policies used the following or similar language:

COMBINED SINGLE AGGREGATE LIMIT OF LIABILITY

Regardless of the number of (1) insureds, under this policy, (2) persons or organizations who sustain bodily injury or property damage or (3) claims made or suits brought on account of bodily injury or property damage, the company's liability is limited as follows:

Coverage A and B—The total liability of the company for all damages because of all bodily injury and property damage to which this policy applies shall not exceed [$]500,000.

Subject to the above provision respecting the total liability of the company for all Bodily Injury and Property Damage to which this policy applies, if an occurrence gives rise to Bodily Injury or Property Damage which occurs partly before and partly within the policy period the liability of the company under this policy for such occurrence shall not exceed $500,000 minus the total of all payments made with respect to such occurrence under a previous policy or policies of which this policy is a replacement.

For the purpose of determining the limit of the company's liability (1) all bodily injury and property damage arising out of the continuous or repeated

566

exposure to substantially the same general conditions shall be considered as arising out of one occurrence[.]

¶ 16. The primary policies issued by Liberty Mutual to Plenco from January 1, 1984, through January 1, 1989, contained a Limits of Liability provision that differed from the above stated provisions, but neither party asserts any meaningful difference exists.

¶ 17. The excess policies issued by Liberty Mutual to Plenco from May 8, 1970, through January 1, 1984, and from January 1, 1986, to January 1, 1988, included the following or similar language:

COVERAGE—EXCESS LIABILITY

The company will pay on behalf of the insured all sums in excess of the retained limit which the insured shall become legally obligated to pay, or with the consent of the company, agrees to pay, as damages, direct or consequential, because of:

(a) personal injury, . . .

with respect to which this policy applies and caused by an occurrence.

¶ 18. The excess policies issued by Liberty Mutual to Plenco from May 8, 1970, through January 1, 1984, and from January 1, 1986, to January 1, 1988, defined "personal injury" using the following or similar language: " 'personal injury' means personal injury or bodily injury which occurs during the policy period sustained by a natural person . . . ."

¶ 19. The excess policies issued by Liberty Mutual to Plenco from May 8, 1970, through January 1, 1984, and from January 1, 1986, to January 1, 1988, defined "occurrence" using the following or similar language: " 'occurrence' means injurious exposure to conditions, which results in personal injury . . . neither expected nor intended from the standpoint of the insured."

¶ 20. The excess policies issued by Liberty Mutual to Plenco from May 8, 1970, through January 1, 1984, and from January 1, 1986, to January 1, 1988, contained a Limits of Liability provision using the following or similar language:

> Regardless of the number of insureds, under this policy or the number of persons or organizations who sustain personal injury, property damage or advertising injury or damage, the company's liability is limited as follows:
>
> Each Occurrence—The limit of liability stated in the declarations as applicable to "each occurrence" is the limit of the company's liability for all damages, direct and consequential, because of all personal injury, property damage, or advertising injury or damage sustained by one or more persons or organizations as the result of any one occurrence.
>
> . . .
>
> For the purpose of determining the limits of the company's liability:
>
> (1) all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions . . .
>
> shall be considered as the result of one and the same occurrence.

¶ 21. The excess policies issued by Liberty Mutual to Plenco from May 8, 1970, through January 1, 1984, and from January 1, 1986, to January 1, 1988, included the following or similar language:

> Non-Cumulation of Liability-Same Occurrence-If the same occurrence gives rise to personal injury, property damage or advertising injury or damage which occurs partly before and partly within any annual period of this policy, the each occurrence limit and the applicable aggregate limit or limits of this policy shall be reduced by the amount of each payment made by the company

with respect to such occurrence, either under a previous policy or policies of which this is a replacement, or under this policy with respect to previous annual periods thereof.

¶ 22. Liberty Mutual has been paying all of Plenco's defense costs, settlements and judgments, and Liberty Mutual advised Plenco that through December 15, 2005, Liberty Mutual has paid approximately $14.3 million in asbestos claims on Plenco's behalf. Liberty Mutual defended Plenco and paid settlements and judgments under a reservation of rights as set forth in correspondence sent to Plenco on or about January 6, 2004, (incorrectly dated January 6, 2003) and June 15, 2004.

## II. PROCEDURAL HISTORY

¶ 23. On September 1, 2004, Plenco filed a complaint against Liberty Mutual seeking declaratory judgment regarding Liberty Mutual's obligation to defend and indemnify Plenco for lawsuits that arose out of the claimants' alleged exposure to Plenco's asbestos-containing products. Liberty Mutual sought declaratory judgment absolving it from the responsibility to pay certain defense and indemnification expenses. On December 15, 2005, the parties stipulated to the pertinent facts regarding their respective summary judgment motions.

¶ 24. On October 27, 2006, the United States District Court for the Eastern District of Wisconsin, Aaron E. Goodstein, United States Magistrate Judge, issued a written decision and order.[6] The district court granted in part and denied in part each party's motion

---

[6] *Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 466 F. Supp. 2d 1071 (E.D. Wis. 2006).

for summary judgment. The district court issued a final declaratory judgment on December 6, 2006, and, in part, concluded the following:

¶ 25. First, each person's injury resulting from exposure to asbestos-containing products constitutes a separate occurrence under Liberty Mutual's policies issued to Plenco. Second, the non-cumulation provisions limit an individual claimant's recovery. Third, Liberty Mutual is obligated to pay all sums arising from an occurrence and is not entitled to a pro rata contribution from Plenco.

¶ 26. Liberty Mutual appealed the district court's first and third conclusions, and Plenco appealed the district court's second conclusion. The United States Court of Appeals for the Seventh Circuit reasoned that the three conclusions present important questions of unresolved Wisconsin law. The court of appeals stated, "[b]ecause current Wisconsin law does not provide sufficient guidance as to how the Wisconsin Supreme Court would resolve these issues, we stay this appeal and certify three questions to the Wisconsin Supreme Court, pursuant to Circuit Rule 52 and Wisconsin Statute § 821.01." This court accepted the certification.

## III. STANDARD OF REVIEW

¶ 27. The interpretation of an insurance contract is a question of law, which this court reviews de novo. *Danbeck v. Am. Family Mut. Ins. Co.*, 2001 WI 91, ¶ 10, 245 Wis. 2d 186, 629 N.W.2d 150. An insurance policy is to be construed so as to give effect to the parties' intentions. *Id.* The contract's words are to be given their common and ordinary meaning, and when the policy language is plain and unambiguous, we enforce the contract as written and without resorting to the rules of

construction or principles from the case law. *Id.* If the contract language is ambiguous, i.e., if it is susceptible to more than one reasonable interpretation, the language is construed in favor of coverage. *Id.*

## IV. ANALYSIS

¶ 28. As stated above, this case presents three questions for review. We conclude that under the language in this policy and the facts of this case, each claimant's repeated exposure is one occurrence; Wis. Stat. § 631.43(1) does not apply to successive insurance policies; and once this policy is triggered, Liberty Mutual must fully defend the lawsuit in its entirety and pay for all sums up to the policy limits that Plenco is obligated to pay because of the injury. The policy language here does not support a pro rata allocation of damages.

## A. Occurrence

■

¶ 29. First, under this policy and the facts of this case, we must determine what constitutes an occurrence and how many occurrences have taken place. Liberty Mutual argues that Plenco's manufacture and sale of asbestos-containing products without warning constitutes one occurrence regardless of the number of people injured. Plenco, on the other hand, argues that each individual's exposure to asbestos, which results in injury, constitutes a single occurrence. Under Plenco's argument, several occurrences have taken place because many people have been exposed over the span of many years. Given the policy language, we agree with Plenco and conclude that each individual's repeated exposure constitutes an occurrence.

¶ 30. At the outset we recognize that the determination of what constitutes an occurrence in asbestos-related claims has produced varying results throughout the country. *See London Mkt. Insurers v. Superior Court*, 53 Cal. Rptr. 3d 154, 161 (Ct. App. 2007) (discussing the different approaches that courts have taken around the country). For example, some courts have concluded that it is the manufacture and sale of asbestos-containing products that constitutes the occurrence.[7] Some courts have concluded that when exposure occurs at the same time and place, despite the fact that many individuals are injured, there is but one occurrence per time and place.[8] Some courts have concluded that the individual claimant's repeated exposure to asbestos-containing products constitutes the occurrence.[9] In this court's view, it is the policy language here that controls the analysis.[10]

[7] *See, e.g., Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330, 334–39 (3d Cir. 2005); *Air Prods. & Chems., Inc. v. Hartford Accident & Indem. Co.*, 707 F. Supp. 762, 772–74 (E.D. Pa. 1989); *Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co.*, 597 F. Supp. 1515, 1524–28 (D.D.C. 1984); *Owens-Illinois, Inc. v. United Ins. Co.*, 625 A.2d 1, 21–23 (N.J. Super. Ct. App. Div. 1993); *U.S. Gypsum Co. v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1257–60 (Ill. Ct. App. 1995).

[8] *See, e.g., Fina, Inc. v. Travelers Indem. Co.*, 184 F. Supp. 2d 547, 549–53 (N.D. Tex. 2002); *Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 765 A.2d 891, 896–909 (Conn. 2001).

[9] *See, e.g., In re Prudential Lines Inc.*, 158 F.3d 65, 79–83 (2d Cir. 1998); *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1212–14 (2d Cir. 1995); *Commercial Union Ins. Co. v. Porter Hayden Co.*, 698 A.2d 1167, 1210–11 (Md. Ct. Spec. App. 1997); *Cole v. Celotex Corp.*, 588 So. 2d 376, 390–91 (La. Ct. App. 1991).

[10] The *London Market* court criticizes a number of the courts cited above for their failure to examine the relevant

## 1. What Constitutes an Occurrence

¶ 31. The policy here defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."[11] In this case, the claimants were allegedly injured by continuous and repeated exposure to asbestos fibers from Plenco's asbestos-containing products. Without exposure, no bodily injury takes place. Our conclusion that exposure to asbestos falls within an exposure to conditions, as referenced in this policy, is the most reasonable, unstrained approach.

---

policy language. *London Mkt. Insurers v. Superior Court,* 53 Cal. Rptr. 3d 154, 161 (Ct. App. 2007). The court states, "while we recognize that consistent interpretation of standardized terms in insurance contracts promotes clear understanding of future contracts, it would be foolish to state as a matter of law that the word occurrence has the same meaning in all insurance contracts." *Id.* (citing *Flintkote Co. v. Gen. Accident Assurance Co.,* 410 F. Supp. 2d 875, 887 (N.D. Cal. 2006)) (internal quotations and ellipses removed).

[11] This definition, which was used in the primary policy from January 1, 1973, through January 1, 1989, and the following two definitions of "occurrence" are taken from the stipulated facts in this case. The parties do not assert that the differences between these three definitions change the meaning of "occurrence"; we agree. As stated in ¶ 12, the primary policy from January 1, 1967, through January 1, 1973, used the following definition of "occurrence": "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." As stated in ¶ 19, the excess policies used the following definition of "occurrence": " 'occurrence' means injurious exposure to conditions, which results in personal injury . . . neither expected nor intended from the standpoint of the insured."

Furthermore, even if we were to conclude that there is more than one reasonable interpretation of this policy language, the policy is still construed in favor of affording coverage to the insured. *See Danbeck,* 245 Wis. 2d 186, ¶ 10 (stating that "[i]f the language is ambiguous, it is construed in favor of coverage").

¶ 32. Liberty Mutual urges us to adopt the conclusion that it is the manufacture and sale of asbestos-containing products without warning that is the occurrence. When looking at the plain language of the policy and applying that policy language to the facts of this case, we are not persuaded by Liberty Mutual's argument.

¶ 33. Liberty Mutual attempts to support its argument that the manufacture and sale without warning is the occurrence by relying on the Limits of Liability provision, which is found in all of the policies with some variation. In forwarding its "sale without warning" occurrence argument, Liberty Mutual asserts that the policy contemplates a single occurrence theory. Liberty Mutual argues that the number of people injured does not dictate the number of occurrences. Liberty Mutual cites to the Limits of Liability provision, which provides, "all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

¶ 34. We disagree with Liberty Mutual's application of the Limits of Liability provision. The Limits of Liability provision in this case functions to limit an individual claimant's repeated and continuous exposure to asbestos-containing products as being just one occurrence. In other words, this provision precludes a claim-

574

ant from asserting that each time he or she was exposed to an asbestos-containing product, a new occurrence arose.

2. Number of Occurrences

¶ 35. When called upon to determine the number of occurrences, we conclude that when we apply the policy language to the facts of this case, each individual's repeated and continuous exposure constitutes an occurrence. Wisconsin has adopted the "cause theory" to determine how many occurrences have taken place. *Olsen v. Moore*, 56 Wis. 2d 340, 348–51, 202 N.W.2d 236 (1972); *see also Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.,* 860 N.E.2d 280, 287 (Ill. 2006) (stating that "the terms of the insurance policy are not always sufficient, standing alone, to permit a definitive determination as to whether a particular case involves one occurrence or many," and as a result, "American courts have developed two basic approaches for assessing the number of occurrences that took place within the meaning of policies"—the cause theory and the effect theory).

¶ 36. Under the cause theory, "where a single, uninterrupted cause results in all of the injuries and damage, there is but one 'accident' or 'occurrence.' " *Welter v. Singer,* 126 Wis. 2d 242, 250, 376 N.W.2d 84 (Ct. App. 1985). "If the cause is interrupted or replaced by another cause, the chain of causation is broken and there has been more than one accident or occurrence." *Id.* (citing *Olsen,* 56 Wis. 2d at 349). *Welter,* therefore, lends further support for the conclusion that a separate occurrence is not found each time the same claimant is exposed to Plenco's product.

¶ 37. In *Welter,* Bruce Welter was riding his bicycle when he was struck by a car. *Welter,* 126 Wis. 2d at 246. The driver initially stopped but then drove forward to move out of the intersection, which led to Welter being dragged beneath the car. *Id.* After initially stopping, the driver moved the car forward a second time and then got out of the car to let someone else behind the wheel. *Id.* This second driver tried to free Welter by backing up about ten feet. *Id.* Welter brought suit alleging four separate causes of action with each cause of action corresponding to the three times the first driver put the car in motion and the one time the second driver put the car in motion. *Id.*

¶ 38. The court of appeals concluded that under the cause theory, only one occurrence took place because the cause and result were "so simultaneous or so closely linked in time and space as to be considered by the average person as one event," and therefore, only a single occurrence had taken place. *Id.* at 251. The court of appeals, relying on *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.,* also stated:

> The general rule is that an occurrence is determined by the cause *or causes* of the resulting injury. . . .
>
> The fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence. As long as the injuries stem from one proximate cause there is a single occurrence.

*Id.* at 250–51 (citing *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.,* 676 F.2d 56, 61 (3d Cir. 1982)).

¶ 39. In the case at hand, each individual claimant's injuries stem from the continued and repeated exposure to asbestos-containing products. Thus,

under the policy language and the cause theory, each claimant's repeated exposure is one occurrence.

¶ 40. Liberty Mutual argues that the number of occurrences is not dictated by the numerous individuals who sustained injuries at varying geographical locations over many years. In addition, it argues that inserting an identity-of-location requirement would rewrite the policies. We, however, inject no such "requirement." The occurrence in this case is the repeated exposure to asbestos-containing products because the policy states that an occurrence is the "continuous or repeated exposure" to conditions. Multiple occurrences arise because each individual's injury stems from his or her repeated exposure to asbestos-containing products.

¶ 41. Liberty Mutual also argues that it is inconsistent with *Society Insurance v. Town of Franklin*, 2000 WI App 35, 233 Wis. 2d 207, 607 N.W.2d 342, to conclude that more than one occurrence has taken place in the case at hand. However, the number of occurrences was not at issue in *Society. Id.*, ¶ 7.[12] Rather, in *Society*, the court of appeals was asked to decide which policies were triggered so the limits of the defendant's liability could be determined. *Id.*, ¶¶ 7–13

---

[12] In *Society*, the parties agreed that only one occurrence had taken place and the court of appeals concluded that "Society must make good on each [triggered] policy." *Society Ins. v. Town of Franklin*, 2000 WI App 35, ¶ 11, 233 Wis. 2d 207, 607 N.W.2d 342. This does not give rise to an inconsistency. The number of policies triggered is distinct from the number of occurrences. The district court, here, seemingly concluded that because there was only one occurrence, multiple policies could not be triggered. However, under a continuous trigger theory, each policy from injury to manifestation may be triggered despite the fact that only one occurrence, the repeated and continuous exposure, caused the injury.

(discussing and applying the continuous trigger theory to determine which policies had been triggered). Unlike today, the court in *Society* was not called upon to determine what constitutes an occurrence or how many occurrences had taken place. In that respect, *Society* does not impact our determination.

¶ 42. Lastly, Liberty Mutual argues that occurrence should be interpreted from the standpoint of the insured, and as a result, it is the sale without warning that is the occurrence. Again, we turn to the language of the policy, which defines "occurrence" as the "continuous or repeated exposure to conditions." The exposure must, quite obviously, be exposure to the injured person and not exposure to Plenco.

¶ 43. Accordingly, when we apply the policy language to the facts of this case, we conclude that each individual's repeated and continuous exposure constitutes an occurrence.

B. Non-cumulation provision

¶ 44. Next, we must determine whether Wis. Stat. § 631.43(1) applies to successive insurance policies. Section 631.43(1), "General," provides:

> When 2 or more policies promise to indemnify an insured against the same loss, no "other insurance" provisions of the policy may reduce the aggregate protection of the insured below the lesser of the actual insured loss suffered by the insured or the total indemnification promised by the policies if there were no "other insurance" provisions. The policies may by their terms define the extent to which each is primary and each excess, but if the policies contain inconsistent terms on that point, the insurers shall be jointly and severally liable to the insured on any coverage where

the terms are inconsistent, each to the full amount of coverage it provided. Settlement among the insurers shall not alter any rights of the insured.

■

¶ 45. Plenco asserts that by adopting Wis. Stat. § 631.43 the legislature sought to prohibit insurers from attempting to reduce their coverage obligations below the aggregate limits of their policies. Plenco accordingly argues that Liberty Mutual's non-cumulation provision does exactly what this statute was meant to prohibit. Liberty Mutual, on the other hand, argues that Wis. Stat. § 631.43(1) is not applicable in the case at hand because the statute applies to concurrent insurance policies. We agree with Liberty Mutual and conclude that Wis. Stat. § 631.43(1) does not apply to successive insurance policies.

¶ 46. This statute applies when two conditions are met: First, the policies must indemnify an insured against the same loss. *See Martin v. Am. Family Mut. Ins. Co.,* 2002 WI 40, ¶¶ 13–15, 19, 23, 252 Wis. 2d 103, 643 N.W.2d 452 (discussing when policies promise to indemnify for the same loss and advocating a case-by-case determination).

¶ 47. Second, this statute applies to "other insurance" provisions. Section 631.43(1) refers specifically to " 'other insurance' provisions" by placing quotes around "other insurance." When the legislature created Wis. Stat. § 631.43, it included, in part, the following note in the Laws of Wisconsin:

> NOTE: This section is adapted from s. 203.11,[13] but extended to all indemnity coverage, including the

---

[13] Wisconsin Stat. § 203.11 (1973–74), "Effect of other policies on same risk," provided in part:

[T]he insuring company shall not be liable for loss or damage occurring while the insured shall have any other contract of

indemnity coverages in disability insurance.... The most important objective of the law is to give the insured full protection with minimum difficulty and joint and several liability does that. The insurers may then settle accounts among themselves. They will usually be able to do so by agreement. If they cannot, a court can do so first by interpreting the terms of the policies and, where they are inconsistent, applying restitutionary principles....

Section 41, ch. 375, Laws of 1975 (footnote added).

¶ 48. The accepted meaning of "other insurance" provisions does not include application to successive insurance policies. In *Progressive Northern Insurance Co. v. Hall,* 2006 WI 13, 288 Wis. 2d 282, 709 N.W.2d 46, when dealing with concurrent policies, we stated:

The purpose of an "other insurance" clause is to define which coverage is primary and which coverage is excess between policies. Wis. Stat. § 631.43(1); *Remiszewski v. American Family Ins. Co.,* 2004 WI App 175, ¶ 29, 276 Wis. 2d 167, 687 N.W.2d 809 (citing § 631.43(1)). " 'Other insurance' clauses govern the relationship between insurers, they do not affect the right of the insured to recover under each concurrent policy." 15 *Couch on Insurance,* § 219.1, at 219–8 (3d ed. 1999).

*Id.,* ¶ 27. "Whenever there are two policies that apply to the same insured at the same time, the issue of which policy must pay first—or which is primary and which is excess—is dealt with by other insurance clauses." Arnold P. Anderson, *Wisconsin Insurance Law* § 11.2 (5th ed. 2004) (discussing "other insurance" clauses and

insurance, ... such other or additional insurance, ... shall nevertheless not operate to relieve the insuring company from liability for loss or damage occurring while the insured shall have such other contract of insurance .... Subject to all other terms and conditions of its policy, each insuring company shall be liable for its proportionate share of any such loss or damage ....

referring to Wis. Stat. § 631.43); *see also* Douglas R. Richmond, *Issues and Problems in "Other Insurance," Multiple Insurance, and Self-Insurance,* 22 Pepp. L. Rev. 1373, 1376–82 (1995) (discussing "other insurance" provisions and stating that " '[o]ther insurance' refers only to two or more policies insuring the same risk, and the same interest, for the benefit of the same person, during the same period").

¶ 49. In this case, neither of the requisite conditions are met, and therefore, Wis. Stat. § 631.43(1) does not apply. The issue is not which of two or more policies pays first because the Liberty Mutual policies are not concurrent policies between competing insurers that apply to the same time period. Therefore, the insured's right to recover is not affected and Wis. Stat. § 631.43 does not apply.

¶ 50. In an attempt to limit the scope of Wis. Stat. § 631.43, Liberty Mutual argued to this court that this statute only applied in the context of automobile policies. We disagree because the text of the statute does not support such a restriction. Moreover, this statute falls under chapter 631 entitled "Insurance Contracts Generally" rather than under chapter 632, subchapter IV, which is entitled "Automobile and Motor Vehicle Insurance." Accordingly, Wis. Stat. § 631.43(1) does not apply to successive insurance policies.

C. Allocation

¶ 51. Lastly, we must decide the extent of Liberty Mutual's duty to defend and indemnify when the claimant's alleged injury does not occur entirely within a policy period. Plenco argues that Liberty Mutual must fully defend the lawsuits and that Liberty Mutual is

obligated to indemnify all sums, up to the policy limits. Liberty Mutual, on the other hand, argues that it need not defend nor indemnify for injury that takes place outside the policy period. We conclude that once this policy is triggered, Liberty Mutual must fully defend the lawsuit in its entirety and that under its policy, Liberty Mutual is responsible for "all sums," up to policy limits, whether the compensation is for damage that occurs "partly before and partly within the policy period."

¶ 52. Again, we acknowledge that courts across the country have largely taken one of two approaches. Some courts have adopted a pro rata approach to allocating damages.[14] Under a pro rata approach, the insurer is responsible for only a pro rata share of the damages based upon the years that it provided coverage relative to years when no coverage was purchased. Thus, an insurer is liable for only the damages that accrue during a policy period. Other courts have adopted an "all sums" approach.[15] Under an all sums approach, the insurer is required to pay all sums that result from bodily injury that has triggered a policy.

[14] *See, e.g., Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.,* 826 A.2d 107, 118 (Conn. 2003); *Domtar, Inc. v. Niagara Fire Ins. Co.,* 563 N.W.2d 724, 732–33 (Minn. 1997); *Spartan Petrol. Co., Inc. v. Federated Mut. Ins. Co.,* 162 F.3d 805, 812 (4th Cir. 1998); *Olin Corp. v. Ins. Co. of N. Am.,* 221 F.3d 307, 322–23 (2d Cir. 2000); *Gulf Chem. & Metallurgical Corp. v. Associated Metals & Minerals Corp.,* 1 F.3d 365, 371–73 (5th Cir. 1993); *Commercial Union Ins. Co. v. Sepco Corp.,* 765 F.2d 1543, 1544 (11th Cir. 1985).

[15] *See, e.g., Hercules, Inc. v. AIU Ins. Co.,* 784 A.2d 481, 490–94 (Del. Super. Ct. 2001); *Allstate Ins. Co. v. Dana Corp.,* 759 N.E.2d 1049, 1058 (Ind. 2001); *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co.,* 951 P.2d 250, 253–54 (Wash.

¶ 53. To determine which policies are triggered, Wisconsin has adopted the continuous trigger theory. *Society,* 233 Wis. 2d 207, ¶¶ 8–9. This approach is especially useful in cases that involve an ongoing exposure to a harmful substance with harm occurring over several policy periods. *Id.* A policy is triggered when injury occurs during the policy period. *Id.,* ¶ 8. Under the continuous trigger theory, all policies are triggered from exposure until manifestation. *Id.* Under the language of this policy, "bodily injury, sickness or disease" "during the policy period" triggers the policy.

¶ 54. Once a policy is triggered, the policy requires Liberty Mutual to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of Coverage A. bodily injury or Coverage B. property damage to which this policy applies, caused by an occurrence . . . ." However, in the years where no policy existed, there are no policy limits to be paid.

¶ 55. In our analysis, we are again driven by the policy language. Liberty Mutual's policy contains no language that limits its obligation to a pro rata share. In fact, the policy obligates Liberty Mutual to pay for injury that occurs "partly before and partly within the policy period." "[I]f an occurrence gives rise to Bodily Injury or Property Damage which occurs partly before and partly within the policy period the liability of the company under this policy for such occurrence shall not exceed $500,000 . . . ." In addition, even if there is arguably some language to support a pro rata allocation, that too is susceptible to more than one reasonable

1998); *J.H. France Refractories Co. v. Allstate Ins. Co.,* 626 A.2d 502, 507 (Pa. 1993); *ACandS, Inc. v. Aetna Cas. & Sur. Co.,* 764 F.2d 968, 974 (3d Cir. 1985).

interpretation, and as a result, we must construe the policy language in favor of coverage. *See Danbeck,* 245 Wis. 2d 186, ¶ 10.

¶ 56. Given Liberty Mutual's definition of "occurrence," which includes "continuous or repeated exposure," Liberty Mutual contemplated a long-lasting occurrence that could give rise to bodily injury over an extended period of time; nonetheless, it failed to specifically include a pro rata clause. Moreover, the language of the aggregate liability section also reflects that Liberty Mutual contemplated coverage for damages that fall outside the policy period.

¶ 57. Liberty Mutual argues that the definition of "bodily injury" supports its pro rata argument. "Bodily injury" is defined as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom." As a result, Liberty Mutual argues that the policy only covers bodily injury that occurs during a policy period. However, bodily injury during the policy period is what triggers the policy; the definition of "bodily injury" is not a limitation of liability clause.

¶ 58. Liberty Mutual also argues that if Plenco did not purchase a policy for specific periods of time, Plenco should not be awarded coverage for those times that it did not pay for coverage. Under the language of this policy—once a policy is triggered by bodily injury, Liberty Mutual is responsible for "all sums" that arise out of the injury, up to that policy's limits.

¶ 59. Liberty Mutual lastly argues that by adopting an all sums approach, we are rewriting the contract. This argument is puzzling given that no pro rata language or clause exists in the contract, and in fact, the phrase "all sums" is in the body of the policy. Thus,

to insert the pro rata language, we would have to rewrite the insurance policy.

¶ 60. In addition to our conclusion that a pro rata approach does not apply to allocating damages here, we also conclude that there can be no pro rata approach to the duty to defend. Under Wisconsin law, if coverage exists, an insurer must defend the entire suit even though some of the allegations fall outside the scope of coverage. *U.S. Fire Ins. Co. v. Good Humor Corp.*, 173 Wis. 2d 804, 824–25, 496 N.W.2d 730 (Ct. App. 1993). Here, the same principle applies. We do not base the scope of a duty to defend upon whether some allegations fall outside of the complaint or whether some of the damages fall partly within and partly outside of a policy period. If the duty to defend arises, the insurer must defend the lawsuit in its entirety.

## V. CONCLUSION

¶ 61. We conclude that under the language in this policy and the facts of this case, each claimant's repeated exposure is one occurrence; Wis. Stat. § 631.43(1) does not apply to successive insurance policies; and once this policy is triggered, Liberty Mutual must fully defend the lawsuit in its entirety and pay for all sums up to the policy limits that Plenco is obligated to pay because of the injury. The policy language here does not support a pro rata allocation of damages.

*By the Court.*—Certified questions of law answered and cause remanded to the United States Court of Appeals for the Seventh Circuit.

¶ 62. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). The Seventh Circuit Court of Appeals certified to

this court the following three questions of law that, according to the certification memorandum of the federal court of appeals, are "unresolved by Wisconsin appellate courts and are likely to recur in future lawsuits:"

(1) What constitutes an "occurrence" in an insurance contract when exposure injuries are sustained by numerous individuals, at varying geographical locations, over many years;

(2) Whether Wisconsin Statute § 631.43(1) applies to successive insurance policies; and

(3) Whether Wisconsin courts would adopt an "all sums" or pro rata allocation approach to determining liability when an injury spans multiple, successive insurance policies.

¶ 63. This court agreed to respond to the three questions of law pursuant to Wis. Stat. § 821.01.[1] This court's function under certification is not to decide the

---

[1] Wisconsin Stat. § 821.01 provides as follows:

The supreme court may answer questions of law certified to it by the supreme court of the United States, a court of appeals of the United States or the highest appellate court of any other state when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the court of appeals of this state.

Under this statute, the certifying court (here the federal court of appeals) retains jurisdiction of the case. This certification process is entirely distinct from the process used when we accept certification from our own Wisconsin court of appeals under Wis. Stat. § 808.05(2). In those cases, we accept jurisdiction of the entire case, and our standard practice is to decide all issues raised in the briefs, rather than to limit our response to the distinct questions of Wisconsin law raised in the certifica-

case but to respond to questions of Wisconsin law so that the federal court may apply the Wisconsin law in deciding the case.

¶ 64. As the federal court of appeals reminds us in its certification memorandum, certification is not appropriate when resolution of the issues has limited precedential effect. Certification is appropriate, according to the federal court of appeals, when resolution of contract questions "will be useful beyond the parameters of the instant dispute."

¶ 65. The majority opinion correctly states that in an insurance coverage dispute such as this one, a court begins its analysis by turning to the language of the policy. Majority op., ¶ 30. If the common and ordinary meaning of the policy language yields a result, there is no occasion to turn to principles derived from the case law. Majority op., ¶ 27. The majority opinion also observes that "the terms of the insurance policy are not always sufficient, standing alone, to permit a definitive determination[.]" Majority op., ¶ 35 (citing *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 860 N.E.2d 280, 287 (Ill. 2006). Here, the Seventh Circuit Court of Appeals clearly concluded that the policy language alone was insufficient to resolve the dispute. If the policy language were sufficient or Wisconsin law were clear, the Seventh Circuit Court of Appeals would not have certified these questions.

¶ 66. Because the majority tries so hard to limit its opinion to the language of the insurance policies at issue and the particularized facts of the instant case, I am concerned that the majority opinion has not re-

tion memorandum of the Wisconsin court of appeals. *See Jackson County v. DNR*, 2006 WI 96, ¶¶ 42–48, 293 Wis. 2d 497, 717 N.W.2d 713 (Abrahamson, C.J., concurring in part, dissenting in part).

sponded to the certified questions of law but has instead decided the merits of the instant case. I do not agree with this approach toward the certified questions.

¶ 67. The majority, in my opinion, does what Liberty Mutual feared: Certification has allowed Plenco to get a decision on the merits of the case from this court instead of from the federal court in which Plenco brought its suit. Liberty Mutual objected to certification, urging the federal court to bind Plenco to its chosen federal forum.[2] By the majority's decision, Plenco has succeeded, in effect, in "removing" its federal case to the state court for a decision. This is not the purpose of a federal court's certifying questions of law to this court. If the certified questions cannot be answered by setting forth Wisconsin law, this court should return the certified questions unanswered.

¶ 68. The parties briefed the first and third issues discussing separately the language of the insurance policies and relevant Wisconsin law. The parties briefed the second issue discussing only Wisconsin law. The majority opinion does not decouple its discussion of the text of the insurance policies and its discussion of relevant Wisconsin law, ultimately deciding the first and third certified questions of law on the basis of the language of the insurance policy and the facts of the instant case.[3] I shall focus on Wisconsin law, as the certification requests. The emphasis of this concurrence is therefore different from the emphasis of the majority opinion. I believe the concurrence is more in keeping with Wis. Stat. § 821.01, the statute governing our answering certified questions.

---

[2] Seventh Circuit Court of Appeals, certification memorandum.

[3] Majority op., ¶¶ 4, 29, 43, 51, 55, 59, 61.

¶ 69. Because I write a concurrence, not a majority opinion, my analysis of Wisconsin law in responding to the certified questions is brief, citing to an explanation of Wisconsin law in the majority opinion whenever possible. As I see it, the federal court will then have to interpret the insurance policies and apply Wisconsin law as set forth by this court.

I

¶ 70. I conclude as a matter of Wisconsin law, as does the majority opinion, that because each claimant's injury-causing exposure to asbestos occurred at different times, different locations, and under a variety of circumstances, involving different products over a 33–year period, each claimant's exposure must be viewed as a separate occurrence.[4]

¶ 71. Liberty Mutual argues that thousands of disparate claims involving thousands of claimants alleging exposure to different asbestos-containing Plenco products, occurring over many decades and at numerous locations across the country, constitute one occurrence and that Plenco's insurance coverage for asbestos claims is limited to a single primary policy ($500,000) for 1977–1984 and one excess policy ($10 million) for 1971–1988. Liberty Mutual asserts that the focus in Wisconsin law is on the underlying circumstance that caused the injury rather than on the number of persons injured. Accordingly, Liberty Mutual asserts that multiple injuries with a single cause count as a single occurrence.

¶ 72. I agree with Liberty Mutual that an occurrence under Wisconsin law can be ongoing and span a

---

[4] Majority op., ¶¶ 36–38, 41.

substantial amount of time but still be one occurrence within Wisconsin law.[5]

¶ 73. Wisconsin has adopted the "cause" analysis, not the "effect" test, for determining the number of occurrences. The focus of the "cause" analysis in a multiple injury situation is on the uninterrupted nature and closeness in time and location between the event and its consequent injuries. Timing and location are therefore critical factors in assessing whether there is a single occurrence or multiple occurrences.

¶ 74. Our court has explained the "cause" test in *Olsen v. Moore,* 56 Wis. 2d 340, 349, 202 N.W.2d 236 (1972), as follows:

> If viewed from the point of view of a cause, it would appear that a single, uninterrupted cause which results in a number of injuries or separate instances of property damage is yet one "accident" or "occurrence." If, however, that cause is interrupted or replaced by another cause the chain of causation is broken and more than one accident or occurrence has taken place.

¶ 75. The instant case does not present one uninterrupted and continuing cause under Wisconsin law, as Liberty Mutual contends. There is no basis under the Wisconsin "cause" analysis for aggregating events widely separated in time, space and circumstances into one occurrence.[6] Liberty Mutual's position sweeps too broadly, and the result it reaches challenges common sense.

---

[5] *See, e.g., Society Ins. v. Town of Franklin,* 2000 WI App 35, ¶ 7, 233 Wis. 2d 207, 607 N.W.2d 342 (parties do not dispute one continuous occurrence when damage was from pollution at one geographical site).

[6] For similar analysis, see, *e.g., Stonewall Ins. Co. v. Asbestos Claims Mgt. Corp.,* 73 F.3d 1178 (2d Cir. 1995); *Pittsburgh*

## II

¶ 76. I conclude, as matter of law, as does the majority opinion, that Wis. Stat. § 631.43(1) does not apply to successive insurance policies. *See* majority op., ¶¶ 44–50.

## III

¶ 77. I agree with the majority opinion that Wisconsin courts would adopt an "all sums" approach to allocating damages and the duty to defend when an injury spans multiple, successive insurance policies. *See* majority op., ¶¶ 51–54, 60.

¶ 78. For the reasons set forth I write separately.

¶ 79. MICHAEL J. GABLEMAN, J. (*concurring in part, dissenting in part*).

¶ 80. I concur in the majority opinion to the extent it holds that each exposed claimant constitutes a separate occurrence and that the non-cumulation clause is not violative of Wis. Stat. § 631.43(1). However, the policies issued to Plenco by Liberty Mutual, by their plain language, do not apply to those portions of bodily injury which occurred during the time periods in which Plenco elected to not purchase insurance coverage from Liberty Mutual. The reason the policies do not so apply is that no such policies were in existence

*Corning Co. v. Travelers Indem. Co.,* 1988 WL 5302 (E.D. Pa. 1988); *Commercial Union Ins. Co. v. Porter Hayden Co.,* 698 A.2d 1167 (Md. Ct. Spec. App. 1997); *Mason v. Home Ins. Co. of Ill.,* 532 N.E.2d 526 (Ill. Ct. App. 1988).

Other courts have concluded that placing a product in the stream of commerce is one occurrence. See cases cited in majority opinion at note 7.

during those periods. Therefore, I respectfully dissent in part from the decision of the majority, authored by my learned and respected colleague.

## I. THE POLICY LANGUAGE

¶ 81. To construe the language of the policy at issue so as to require Liberty Mutual to indemnify for "all sums" is to effectuate by judicial fiat policy coverage where none has been purchased and none has been provided. It is, in effect, to reward the uninsured corporation for its failure to purchase insurance coverage by requiring its uncompensated provision, a condition neither supported by a fair and comprehensive reading of the entire policy nor contemplated by the parties.[1]

¶ 82. This court should decline to grant coverage for periods in which none was bargained for by applying a time-on-the-risk pro rata allocation of a loss between successive insurers and the insured when an occurrence takes place partly outside policy periods. Under the time-on-the-risk pro rata approach, each insurer is liable only for the portion of occurrence taking place while that insurer is on the risk. A corollary to this approach is that the insured retains the risk during any period for which it did not purchase insurance.

### A. Pro rata Allocation

¶ 83. The majority states that the pro rata approach is contrary to the policies' plain language, partly

---

[1] *See Pub. Serv. Co. of Colo. v. Wallis and Cos.*, 986 P.2d 924, 939–40 (Colo. 1999)(noting that the joint and several allocation approach "creates a false equivalence between an insured who has purchased insurance coverage continuously for many years and an insured who has purchased only one year of insurance coverage").

592

because the words "all sums" appear in the policies and the words "pro rata" do not. However, courts in several jurisdictions have interpreted policy language essentially identical to the "all sums" language at issue in the present case[2] and have determined that language to require a pro rata method of allocation. Those jurisdictions include the United States Courts of Appeals for the Second, Third, Fourth, Sixth, Seventh, and Eighth Circuits, Colorado, Connecticut, Delaware, Illinois, Kansas, Louisiana, Maryland, Michigan, Minnesota, New Hampshire, New Jersey, New York, and Vermont.[3]

[2] The phrases "all sums" and "during the policy period" are common to the policy of all of these cases, with only slight variations as to whether the quoted portion of the policy refers to occurrences taking place during the policy period or instead mentions the bodily injury or property damage taking place during the policy period.

[3] *Nationwide Ins. Co. v. Cent. Mo. Elec. Coop., Inc.*, 278 F.3d 742 (8th Cir. 2001)(applying Missouri law); *Sybron Transition Corp. v. Sec. Ins. of Hartford,* 258 F.3d 595 (7th Cir. 2001)(applying New York law); *Olin Corp. v. Ins. Co. of N. Am.*, 221 F.3d 307 (2d Cir. 2000)(applying New York law); *Spartan Petro. Co., Inc. v. Federated Mut. Ins. Co.,* 162 F.3d 805 (4th Cir. 1998)(applying South Carolina law); *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co.*, 89 F.3d 976 (3d Cir. 1996)(applying New Jersey law); *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.,* 73 F.3d 1178 (2d Cir. 1995)(applying New York and Texas law); *Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.,* 633 F.2d 1212 (6th Cir. 1980)(applying Illinois and New Jersey law); *Pub. Serv. Co. of Colo. v. Wallis and Cos.*, 986 P.2d 924 (Colo. 1999); *Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 826 A.2d 107 (Conn. 2003); *E.I. du Pont de Nemours and Co. v. Admiral Ins. Co.,* No. 89C-AU-99, 1995 Del. Super. LEXIS 488, 1995 WL 654020 (Del. Super. Ct. 1995); *Mo. Pac. R.R. Co. v. Int'l Ins. Co.,* 679 N.E.2d 801 (Ill. App. Ct. 1997); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 670 N.E.2d 740 (Ill. App. Ct. 1996); *Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.,* 71 P.3d 1097 (Kan. 2003); *Norfolk S. Corp. v. Cal. Union Ins. Co.,* 859 So. 2d 201 (La. Ct.

Many of those courts applied pro rata allocation in conjunction with the continuous trigger approach as followed in Wisconsin.[4] Additionally, courts in Kentucky and Utah have required pro rata allocation in cases in which the opinions specify that the policy obligated the insurer to pay "all sums" the insured became legally obligated to pay as damages due to bodily injury or property damage caused by an occurrence, but the opinions were silent as to whether the policies limited coverage to occurrences, injury, or damage taking place "during the policy period."[5] Moreover, the United States

---

App. 2003); *Mayor and City Council of Baltimore v. Utica Mut. Ins. Co.*, 802 A.2d 1070 (Md. Ct. Spec. App. 2002); *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 594 N.W.2d 61 (Mich. Ct. App. 1998); *Domtar, Inc. v. Niagara Fire Ins. Co.*, 552 N.W.2d 738 (Minn. Ct. App. 1996); *EnergyNorth Natural Gas, Inc. v. Certain Underwriters at Lloyd's*, 934 A.2d 517 (N.H. 2007); *Owens-Illinois, Inc. v. United Ins. Co.*, 650 A.2d 974 (N.J. 1994); *Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 774 N.E.2d 687 (N.Y. 2002); *Towns v. N. Sec. Ins. Co.*, 964 A.2d 1150, 2008 Vt. 98 (Vt. 2008).

[4] *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co.*, 89 F.3d 976 (3d Cir. 1996); *Pub. Serv. Co. of Colo. v. Wallis and Cos.*, 986 P.2d 924 (Colo. 1999); *Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 826 A.2d 107 (Conn. 2003); *E.I. du Pont de Nemours and Co. v. Admiral Ins. Co.*, No. 89C-AU-99, 1995 Del. Super. LEXIS 488, 1995 WL 654020 (Del. Super. Ct. 1995); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 670 N.E.2d 740 (Ill. App. Ct. 1996); *Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.*, 71 P.3d 1097 (Kan. 2003); *Mayor and City Council of Baltimore v. Utica Mut. Ins. Co.*, 802 A.2d 1070 (Md. Ct. Spec. App. 2002); *EnergyNorth Natural Gas, Inc. v. Certain Underwriters at Lloyd's*, 934 A.2d 517 (N.H. 2007); *Owens-Illinois, Inc. v. United Ins. Co.*, 650 A.2d 974 (N.J. 1994); *Towns v. N. Sec. Ins. Co.*, 964 A.2d 1150, 2008 Vt. 98 (Vt. 2008).

[5] *Aetna Cas. & Sur. Co. v. Commonwealth of Ky.*, 179 S.W.3d 830 (Ky. 2005); *Sharon Steel Corp. v. Aetna Cas. and Sur. Co.*, 931 P.2d 127 (Utah 1997).

Court of Appeals for the Fifth Circuit applied pro rata allocation for a policy that bound the insurer to pay "those sums" that the insurer became obligated to pay because of bodily injury or property damage "to which this insurance applies."[6]

¶ 84. Plenco uses the "all sums" label to great effect in a bootstrapping argument by pointing to the "all sums" language in the policy as justification for adopting what it calls the "all sums" allocation method.[7]

¶ 85. The plain language of the policy relieves Liberty Mutual from indemnifying Plenco for any portion of an occurrence taking place in part outside the period of a Liberty Mutual policy. The Comprehensive General Liability ("CGL") policy at issue here, like almost every other standardized CGL policy, provides that the insurer "will pay on behalf of the insured all sums which the insured shall become obligated to pay as damages because of . . . bodily injury or . . . property damage to which the policy applies, caused by an occurrence . . . ." The policy definitions of both "bodily injury" and "property damage" are limited to that "which occurs during the policy period . . . ." Thus, the

---

[6] *Gulf Chem. and Metallurgical Corp. v. Associated Metals & Minerals Corp.,* 1 F.3d 365 (5th Cir. 1993)(applying Texas law).

[7] The name assigned to the allocation method cannot drive our analysis because there is no limit to the labels that could be applied to any particular allocation method. For instance, one court, in rejecting joint and several allocation, referred to it as the "pick-and-choose" allocation method which allows insureds to consider an occurrence taking place over many years, during some of which there was no coverage, pick a year for which there was coverage, and then choose to assign the entirety of damages to that year. *See Pub. Serv. Co. of Colo. v. Wallis and Cos.,* 986 P.2d 924 (Colo. 1999).

plain language of the policy makes clear that Plenco has purchased coverage only for bodily injury and property damage taking place *during the policy period,* and that there is no provision of coverage for periods for which no insurance has been purchased.

¶ 86. The majority claims that the policy's limitation of coverage to bodily injury or property damage "which occurs during the policy period" is actually only a description of the trigger for the policy, and that it does not determine the scope of liability once triggered. Majority op., ¶ 57. The primary fault with this claim is its silence as to what then serves as the trigger for coverage for injuries and damages that indisputably took place during a time when Plenco chose to proceed self-insured and Liberty Mutual therefore issued no policies. The phrase "which occurs during the policy period" cannot be merely trigger language because, under that logic, during any period for which there was no policy there would, by definition, be no such trigger phrase and, therefore, no coverage, yet the majority urges exactly the opposite result. I maintain that injuries taking place when no policy is in effect cannot trigger an expired previous policy, a non-existent policy for the current period, or any future policy that may be purchased. This position is in harmony with the continuous trigger approach, as illustrated by the previously cited cases from ten jurisdictions applying a continuous trigger analysis while also applying pro rata allocation to allow insurance coverage only for those periods for which the insured purchased such coverage. *See* cases cited *supra* note 4.

¶ 87. The majority incompletely quotes a portion of the policy's Combined Single Aggregate Limit of Liability Endorsement in order to claim that the policy's plain language supports imposition of coverage

that was never requested or paid for. Majority op., ¶ 55. The majority offers as its basis this first portion: "[I]f an occurrence gives rise to Bodily Injury or Property Damage which occurs partly before and partly within the policy period the liability of [Liberty Mutual] under this policy for such occurrence shall not exceed $500,000 . . . ." *Id.* However, the majority's analysis fails to acknowledge that the quoted provision continues: "minus the total of all payments made with respect to such occurrence under a previous policy or policies of which this policy is a replacement." Thus, the majority has cited as its basis nothing more than a statement that the per occurrence liability limit still applies if an occurrence extends across multiple policy periods.[8] On its face, this language contemplates successive Liberty Mutual policies, and cannot be reasonably interpreted by the majority to mean:

> If an occurrence gives rise to Bodily Injury or Property Damage before this policy goes into effect and during a time when Liberty Mutual did not provide any other coverage, Liberty Mutual will fully defend and indemnify the insured anyway, up to the full amount of the loss, even for periods when no coverage was in place.

To the contrary, the non-cumulation clause only means that Plenco cannot horizontally stack the per occurrence liability limits of successive policies. Put another way, this clause merely restricts the coverage to the limit associated with the policy or policies in effect at the time of the occurrence. The clause precludes the insured from "stacking" successive per occurrence limits to obtain a coverage amount which is greater than the

---

[8] In fact, this is the exact non-cumulation clause that resolves the second certified question regarding stacking of coverage limits, but it has no bearing on what allocation method should be applied in the present case.

597

coverage amount which it has purchased. It is unreasonable to read into this language anything more.

## 1. Pro rata Allocation of Defense Costs

¶ 88. I also acknowledge an insurer's duty in Wisconsin to defend a suit in full, even if some of a claim's allegations fall outside the scope of coverage, so long as coverage for some portion of the claim is fairly debatable. *See Doyle v. Engelke,* 219 Wis. 2d 277, 285 n.4, 580 N.W.2d 245 (1998); *Red Arrow Prods. Co. v. Employers Ins. of Wausau,* 233 Wis. 2d 114, 124, 607 N.W.2d 294 (Ct. App. 2000). The plain language of the policies, however, obligates Liberty Mutual to defend suits only for bodily injury or property damage occurring "during the policy period." For bodily injury or property damage occurring outside the policy period, Plenco is self-insured and should be required to bear its own defense costs. Here, Liberty Mutual does not propose to provide only a partial defense on some claims. Rather, it offers to provide a full defense, per Wisconsin precedent, but to pay for such full defense only in proportion to the time it was on the risk that gave rise to the claim it is fully defending. If this court were to apply the time-on-the-risk pro rata allocation method for indemnity, then the insurer could advance the cost of the entire defense, with a pro rata setoff applied at the end of the suit according to the insurer's time on the risk, thereby accounting for the insured's time as a self-insurer.

¶ 89. While the court of appeals has held that "apportionment of responsibility for the defense is neither practical nor desirable,"[9] a time-on-the-risk pro

---

[9] *Grube v. Daun,* 173 Wis. 2d 30, 73, 496 N.W.2d 106 (Ct. App. 1992)(citing *Engsberg v. Town of Milford,* 597 F. Supp. 251 (W.D. Wis. 1984)).

rata allocation of defense costs is practical, desirable, and reasonable. It provides the insured with a full and seamless defense, but also adheres to the plain language of the policies that shifts the risk of defense costs to the insurer only for bodily injury occurring "during the policy period." If this court determines in the present case that indemnity liability should be allocated pro rata based on each policy's time on the risk, then the court will have already laid the clear, certain, and consistent framework by which notoriously indivisible defense costs could be reliably and transparently allocated. This approach is both reasonable and capable of efficient administration by mathematical calculation of the insurer's time on the risk, and has been adopted by several jurisdictions. *See, e.g., Gulf Chem. & Metal lurgical Corp. v. Associated Metals & Minerals Corp.,* 1 F.3d 365 (5th Cir. 1993); *Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.,* 633 F.2d 1212 (6th Cir. 1980); *Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.,* 826 A.2d 107 (Conn. 2003). The federal district court for the eastern district of Michigan explained in *Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp.,* 685 F. Supp. 621, 626 (E.D. Mich. 1987)(citations omitted):

> An insurer on the risk during the period of alleged exposure is liable for the policyholders' defense in the proportion that the period it was on the risk bears to the total period of alleged exposure. . . . The policyholders must bear their own pro rata share of costs for any period during which they had no coverage or cannot identify the insurer.

## B. Joint and Several Allocation of Indemnity

¶ 90. This case does not present the proper factual basis for the majority to apply joint and several allocation because, unlike many of the cases on which

the majority relies,[10] there are no successive insurers from which Liberty Mutual can seek contribution. Typically the joint and several approach is utilized for the convenience and protection of the insured, who can choose one solvent insurer from which to seek payment quickly and with a minimum of litigation complexity.[11] That chosen insurer then later seeks contribution, either through litigation or negotiation, from other insurers on the risk during portions of the occurrence.[12] Therefore, joint and several allocation is really just a two-step version of the pro rata allocation method

[10] *See, e.g., ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 764 F.2d 968 (3d Cir. 1985); *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502 (Pa. 1993)(citing *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034 (D.C. Cir. 1981), *cert. denied*, 455 U.S. 1007 (1982)).

[11] In the situation of several insurers on the risk during an occurrence, the joint and several approach best protects the insured by insulating it from the complex, costly, and time-consuming litigation and negotiation that the insurers will engage in to determine their respective contribution. Long before the contribution matters will be resolved among the insurers, the insured will have been made whole with minimal disruption. These benefits of the joint and several allocation approach, however, do not justify imposing coverage when such coverage was not purchased or was expressly rejected.

[12] *See Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1051–52 (D.C. Cir. 1981), *cert. denied*, 455 U.S. 1007 (1982).

> The possibility of additional coverage can be determined consensually among insurers, or it can be adjudicated among insurers in a subsequent lawsuit. At that point the insurance obligations can be reallocated among all the insurers whose policies are found to cover a particular injury. . . . [I]f a suit arises to resolve the allocation of insurance liability, any insurance company can try to prove that there was no inhalation of [the insured's] asbestos during or before its policy period. If an insurance company does so, then that company will be free of liability.

600

because under joint and several allocation the insured gets paid in the first step and the insurers fight over contribution in the second step. The biggest difference in the present case, however, is that the majority is imposing coverage for periods when the insured bargained for none, whereas a pro rata allocation would allocate the loss among all insurers, including self-insurers, for the time each was on the risk.

¶ 91. In the present case, Liberty Mutual is the only insurer at issue, unless we treat Plenco, as we rightfully should, as a self-insurer for the periods during which it purchased no insurance. If, during any given period, Plenco failed to purchase an insurance policy, thereby shifting the risk to an insurer, then it follows that Plenco retained that risk for that period. It follows there from that Plenco should be held to account for damages springing from that risk during the uninsured period. Under a strict application of the joint and several approach applied today by the majority, Liberty Mutual should be entitled to bring suit against Plenco for contribution, thereby effectuating an allocation of loss that precisely mirrors the allocation of risk that Plenco made when it chose to purchase insurance for some periods but at other times chose to retain the premiums and remain self-insured.[13] Such a contribution action would result in exactly the same outcome as if the court today applied the time-on-the-risk pro rata approach, but only after the filing and litigation of a secondary and utterly inefficient suit that could much more efficiently and justly be determined by applying a time-on-the-risk pro rata allocation when the dispute

---

[13] *See, e.g., Uniroyal, Inc. v. Home Ins. Co.,* 707 F. Supp. 1368, 1392 (E.D.N.Y. 1988)("Self-insurance is called 'going bare' for a reason.").

centers on periods for which the insured purchased no coverage.

## II. ILLUSTRATIVE HYPOTHETICALS

¶ 92. Two hypothetical scenarios, set forth below, may best illustrate the inequitable result of the majority's holding. In the first scenario, after years of exposure to other firms' asbestos, Worker 1 was exposed to Plenco's asbestos-containing molding compounds for one day in 1972 while a Liberty Mutual CGL policy was in effect for Plenco. If Worker 1 died of an asbestos-related illness ten years later and his estate were to sue Plenco, under the joint and several allocation method applied today by the majority, Liberty Mutual would be liable for all of the worker's damages for the entire period from 1972 to 1982, including those stemming from his death, even if Plenco only purchased insurance coverage for one of those years. This would constitute a windfall for Plenco, which purchased only one year of coverage but received ten years of indemnity. From Liberty Mutual's perspective, it received only one year of premiums—which were set based upon the assumption of only one year of risk—but would be forced to pay for ten years of coverage.

¶ 93. In the second scenario, Worker 2 was exposed to asbestos every day for 30 years during which Plenco's CGL policies from Liberty Mutual contained a valid exclusion for product hazards coverage. If the policy containing the exclusion expired the day before Worker 2 retired (never to be exposed to asbestos again) and the new policy omitted the product hazards exclusion, then under the majority's decision Plenco would receive full indemnity and defense for all of the worker's damages when he or his estate sues years later. Under the majority's approach, it would not matter that the

worker was exposed during only one day of coverage, that he had been exposed for the previous 29 years and 364 days with no coverage, or that Plenco promptly cancelled the policy after the worker retired and never paid Liberty Mutual another premium. This result is inequitable, yet unavoidable under the majority's approach. The more reasonable approach under this second scenario would be to require the insured to pay for damages and defense costs for occurrences, bodily injury, or property damage taking place outside the period for which it purchased coverage.

## III. CONCLUSION

¶ 94. In summary, I am not opposed to holding one insurer liable for an occurrence's entire loss under a joint and several liability theory and then permitting that insurer to seek contribution from other insurers on the risk during the occurrence, including self-insurers. However, I am opposed to forcing an insurer to pay for the entirety of a loss occurring partly or even primarily during a period for which the insured did not bargain to shift the risk of that loss from the insured to the insurer. The illogical result of the majority's decision is that the insured not only keeps the insurance premiums that it did not pay, but also receives coverage under the insurance policies that it did not purchase. In a situation such as the present case where the insured was self-insured for significant periods and thereafter purchased insurance from only one insurer—leaving no other insurer from which Liberty Mutual may seek contribution—the joint and several allocation approach would make sense only if we were to allow contribution from Plenco via a setoff for the periods of the occurrences during which Plenco was self-insured. I would support application of such a modified or hybrid joint

and several allocation method, but cannot support the provision of insurance coverage where the insured may have made a strategic business calculation to not purchase insurance coverage, and then, after a loss occurred, sought judicial imposition of the very indemnity and defense coverage that the insured previously rejected and for which it did not bargain or pay a premium.

¶ 95. For the foregoing reasons I respectfully concur in part and dissent in part.